*PRELIMINARY PRINT*

VOLUME 602 U. S. PART 1

PAGES 101–142

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

MAY 23, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.  Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# BROWN *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 22–6389. Argued November 27, 2023—Decided May 23, 2024*

These cases concern the application of the Armed Career Criminal Act to state drug convictions that occurred before recent technical amendments to the federal drug schedules. ACCA imposes a 15-year mandatory minimum sentence on defendants who are convicted for the illegal possession of a firearm and who have a criminal history thought to demonstrate a propensity for violence. As relevant here, a defendant with "three previous convictions" for "a serious drug offense" qualifies for ACCA's enhanced sentencing. 18 U. S. C. § 924(e)(1). For a state crime to qualify as a "serious drug offense," it must carry a maximum sentence of at least 10 years' imprisonment, and it must "involv[e] . . . a controlled substance . . . as defined in section 102 of the Controlled Substances Act." §§ 924(e)(1), (2)(A)(ii).

Under the categorical approach, a state drug offense counts as an ACCA predicate only if the State's definition of the drug in question "matche[s]" the definition under federal law. *Shular* v. *United States,* 589 U. S. 154, 158. The question presented is whether a state crime constitutes a "serious drug offense" if it involved a drug that was on the federal schedules when the defendant possessed or trafficked in it but was later removed.

Petitioners Justin Rashaad Brown and Eugene Jackson were separately convicted of the federal crime of possession of a firearm by a convicted felon in violation of § 922(g)(1). In both cases, an ACCA enhancement was recommended based on prior state felony drug convictions. And both defendants argued that their prior convictions did not qualify as "serious drug offense[s]."

Brown's presentence report identified several Pennsylvania drug convictions, including four convictions for possessing marijuana with intent to distribute. At the time of Brown's marijuana convictions, the federal and Pennsylvania law definitions of marijuana matched. But while Brown's federal § 922(g)(1) charge was pending, Congress modified the federal definition of marijuana. Because the federal and state definitions did not fully match when Brown was sentenced, Brown argued

---

*Together with No. 22–6640, *Jackson* v. *United States*, on certiorari to the United States Court of Appeals for the Eleventh Circuit.

that his marijuana convictions no longer qualified as "serious drug offense[s]" for purposes of the ACCA sentencing enhancement.

Jackson's presentence report identified several prior Florida convictions, including convictions in 1998 and 2004 for possession and distribution of cocaine. In 2015, the Federal Government amended the federal definition of cocaine, so the federal and Florida definitions no longer matched when Jackson committed his § 922(g)(1) offense. Like Brown, Jackson argued that these prior convictions no longer qualified as "serious drug offense[s]." In both cases, the District Courts disagreed and sentenced petitioners to enhanced sentences, and the respective appellate courts ultimately affirmed.

*Held*: A state drug conviction counts as an ACCA predicate if it involved a drug on the federal schedules at the time of that offense. Pp. 108–123.

(a) The parties propose three different answers to the question whether the federal and state definitions of a drug must match when the state crime is committed or at some later point in time. The Government argues that a prior state drug conviction qualifies if the federal and state definitions of the relevant drug matched when the defendant committed the state crime. Jackson argues instead that the definitions must match when the defendant violates the federal felon-in-possession statute. Finally, Brown contends that the definitions must match when the defendant is *sentenced* for the federal felon-in-possession offense. Pp. 108–111.

(b) Precedent and statutory context support the Government's interpretation. ACCA gauges what a defendant's "history of criminal activity" says about his or her "culpability and dangerousness." *McNeill* v. *United States*, 563 U. S. 816, 823. In previous cases, the Court has held that ACCA requires sentencing courts to examine the law as it was when the defendant violated it. This "backward-looking" approach, *id.*, at 820, supports the Government's interpretation. And the plain language of the statute points to the same conclusion. Section 924(e)(2)(A)(i), which immediately precedes the provision at issue, defines a "serious drug offense" to include, among other things, "offense[s] under the Controlled Substances Act." A later change in a federal drug schedule does not change the fact that an offense "under the [CSA]" is a "serious drug offense." The Government's interpretation would treat state offenses "involving . . . a controlled substance (as defined in [the CSA])" like those federal offenses "under the [CSA]." Petitioners' interpretations, by contrast, would treat those federal and state offenses differently, *i. e.*, the federal offense would remain an ACCA predicate, but the state offense would not. Pp. 111–113.

Syllabus

(c) The Government's interpretation also best fulfills ACCA's statutory objectives. In Congress's view, defendants who have repeatedly committed ACCA predicate offenses are "especially likely to inflict grave harm when in possession of a firearm," so ACCA imposes a higher punishment when they do so. *Wooden* v. *United States*, 595 U. S. 360, 375. Because a defendant's "history of criminal activity" does not "cease to exist" merely because the crime was later redefined, *McNeill*, 563 U. S., at 823, it makes sense to ask whether a prior offense met ACCA's definition of seriousness at the time it was committed. Brown's and Jackson's contrary arguments misunderstand the theory on which ACCA is based. A prior drug conviction for an offense punishable by 10 years' imprisonment augurs a risk of future dangerousness even if the drug is no longer considered dangerous. Indeed, in *McNeill*, the Court found "absurd" petitioner's argument that a later reduction in the maximum sentence for his offense reflected a legislative judgment that his prior offense was less serious than previously thought. *Id.*, at 822. The "subsequent chang[e] in state law" did not "erase [the] earlier conviction." *Id.*, at 823. And it was the fact of that earlier conviction—not the legislature's subsequent judgment—that ACCA was concerned with, because that fact "demonstrate[d]" the defendant's "culpability and dangerousness." *Ibid.* Pp. 113–115.

(d) Petitioners various other arguments are unpersuasive. Pp. 115–123.

(1) Relying on the so-called reference canon, Jackson claims that ACCA "incorporates [the] schedules . . . 'as [they] exis[t] whenever a question under [ACCA] arises.'" Brief for Petitioner Jackson 32. The reference canon provides that a statutory reference to a "*general* subject" incorporates "the law on that subject as it exists whenever a question under the statute arises." *Jam* v. *International Finance Corp.*, 586 U. S. 199, 209 (emphasis added). But a reference "to another statute by specific title or section number"—such as ACCA's reference to 21 U. S. C. § 802—"in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted." *Ibid.* Even assuming that there may be contexts in which references to specific statutory provisions may be considered general, it is hard to see the phrase "as defined in section 102 of the Controlled Substances Act" as anything but a specific reference. Jackson's alternative argument—that his reading is required by the "settled legal principle" that "the law that sets the penalty for a federal crime is the law in place when the crime was committed"—simply begs the question what § 924(e)(2)(a)(ii) means. Pp. 115–118.

(2) Brown suggests that present-tense language in ACCA's definition of a "serious drug crime"—language such as "involving" and "as defined in"—indicates a present-day focus requiring courts to look to the drug schedules in effect at the time of federal sentencing. The Court rejected that approach in *McNeill*, holding that ACCA requires a historical inquiry into the state law at the time of that prior offense and that "[u]se of the present tense . . . d[id] not suggest otherwise." 563 U. S., at 820. Brown also claims that his reading is required by *United States* v. *Schooner Peggy*, 1 Cranch 103, 110, which says that when the law changes while a case is in progress, the case must be decided under the new law. But §924(e)(2)(A)(ii) has not changed at any point in the litigation. Pp. 119–120.

(3) Petitioners' additional arguments do not persuade. Petitioners assert that this Court's interpretation is underinclusive because it would preclude ACCA enhancements for state offenses involving drugs added to the federal lists only after the state crimes were committed. But none of the parties' interpretations captures all cases involving career criminals. Petitioners next suggest that the Government's interpretation is absurd because it would exclude all state drug convictions before the CSA's enactment in 1970. But there are reasons Congress might have chosen not to court either federal or state drug convictions that occurred before 1970. Petitioners also argue that the Government's interpretation would unduly burden courts and defendants by requiring them to undertake the laborious task of digging up old federal drug schedules and comparing those to the state laws the defendants violated, but petitioners overstate the difficulty of this task. Finally, petitioners contend that the rule of lenity counsels in favor of their interpretations. But lenity applies only if a statute remains grievously ambiguous, and here context, precedent, and statutory design adequately show " 'what Congress intended.' " *United States* v. *Castleman*, 572 U. S. 157, 173. Pp. 121–123.

No. 22–6389, 47 F. 4th 147, and No. 22–6640, 55 F. 4th 846, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, SOTOMAYOR, KAVANAUGH, and BARRETT, JJ., joined. JACKSON, J., filed a dissenting opinion, *post*, p. 123, in which KAGAN, J., joined, and in which GORSUCH, J., joined as to Parts I, II, and III.

*Jeffrey T. Green* argued the cause for petitioner in No. 22–6389. With him on the briefs were *Tobias S. Loss-Eaton, Peter A. Bruland, Heidi R. Freese, Ronald A. Krauss, Meredith R. Aska McBride*, and *Naomi A. Igra. Andrew L.*

*Adler* argued the cause for petitioner in No. 22–6640. With him on the briefs were *Jeffrey L. Fisher*, *Pamela S. Karlan*, *Easha Anand*, and *Davina T. Chen*.

*Austin L. Raynor* argued the cause for the United States in both cases. With him on the brief were *Solicitor General Prelogar*, *Acting Assistant Attorney General Argentieri*, *Deputy Solicitor General Feigin*, and *David M. Lieberman*.*

JUSTICE ALITO delivered the opinion of the Court.

These cases concern the application of the Armed Career Criminal Act (ACCA) to state drug convictions that occurred before recent technical amendments to the federal drug schedules. ACCA imposes a 15-year mandatory minimum sentence on defendants who are convicted for the illegal possession of a firearm and have a criminal history that is thought to demonstrate a propensity for violence. These defendants are subject to ACCA's enhanced penalty if, among other things, they have "three previous convictions" for "a serious drug offense." 18 U. S. C. § 924(e)(1). For a state crime to qualify as a "serious drug offense," it must carry a maximum sentence of at least 10 years' imprisonment, and it must "involv[e] . . . a controlled substance . . . as defined in section 102 of the Controlled Substances Act" (CSA). §§ 924(e)(1), (2)(A)(ii). The CSA, in turn, includes five schedules of controlled substances and provides that these schedules must be updated each year by the Attorney General. 84 Stat. 1245, 1247, 21 U. S. C. §§ 811, 812.

---

*Briefs of *amici curiae* urging reversal in No. 22–6640 were filed for the Clause 40 Foundation by *Douglas E. Litvack*; and for FAMM by *Christopher G. Michel*, *Mary Price*, and *Peter Goldberger*.

*Christopher G. Michel*, *Mary Price*, and *Peter Goldberger* filed a brief for FAMM as *amicus curiae* urging affirmance in No. 22–6389.

Briefs of *amici curiae* in both cases were filed for the National Association of Criminal Defense Lawyers by *Daniel E. Jones* and *David Oscar Markus*; and for the National Association of Federal Defenders by *Ginger D. Anders*, *Keith M. Donoghue*, *Judith H. Mizner*, and *Daniel Habib*.

The two cases now before us present the question whether a state crime constitutes a "serious drug offense" if it involved a drug that was on the federal schedules when the defendant possessed or trafficked in it but was later removed. We hold that such an offense qualifies.

## I

### A

In 2016, Justin Rashaad Brown sold cocaine to police officers in a series of controlled buys. The officers conducted two warrant-authorized searches of Brown's home, where they discovered cocaine and a loaded .38-caliber revolver. In 2018, a federal grand jury returned an indictment charging Brown with several drug offenses, as well as possession of a firearm by a convicted felon in violation of 18 U. S. C. § 922(g)(1). Brown pleaded guilty in 2019 and was sentenced two years later.

At sentencing, the probation office recommended that Brown receive ACCA's mandatory minimum sentence because he had four prior Pennsylvania convictions for possessing marijuana with intent to distribute between 2009 and 2014, as well as one Pennsylvania conviction for distributing cocaine in 2008. Brown disputed this interpretation of ACCA and argued that his marijuana convictions did not "involv[e] . . . a controlled substance . . . as defined in [the CSA]." § 924(e)(2)(A)(ii).

A state drug offense counts as an ACCA predicate only if the State's definition of the drug in question "matche[s]" the definition under federal law. *Shular* v. *United States*, 589 U. S. 154, 158 (2020). When Brown was convicted for possessing marijuana, both federal and Pennsylvania law defined marijuana to include "all parts of the plant Cannabis sativa L.," so the definitions were a categorical match. 21 U. S. C. § 802(16) (2006 ed.); Pa. Stat. Ann., Tit. 35, § 780–102(b) (Purdon Cum. Supp. 2012) (defining marijuana to include "all forms, species and/or varieties of the genus Can-

nabis sativa L.").   But while Brown's federal charge was pending, Congress enacted the Agriculture Improvement Act of 2018, which exempted some hemp, a variety of Cannabis sativa L., from the federal definition of marijuana.   Pub. L. 115–334, §12619(a)(2), 132 Stat. 5018.[1]   Because the federal and state definitions did not fully match when Brown was sentenced, he argued that his marijuana convictions no longer qualified as "serious drug offense[s]."

The District Court disagreed and sentenced him under ACCA, and the Third Circuit affirmed.   It concluded that the 2018 amendment did not apply retroactively to federal offenses committed before its effective date.   Under the Third Circuit's view, Brown was "properly subject to . . . ACCA's enhanced penalties" because he violated §922(g) when the federal and state definitions of marijuana were a categorical match.   47 F. 4th 147, 153, 155 (2022).

## B

In 2017, Eugene Jackson noticed a police car arriving at the Sparkle Food Market to execute an unrelated search warrant, and he responded by fleeing and discarding a loaded .45-caliber pistol.   Officers eventually identified Jackson as the gun's owner, and in 2019, he was charged with possession of a firearm by a convicted felon.   He pleaded guilty and was sentenced in 2021.

Jackson's presentence report identified several prior Florida convictions as ACCA predicates, including convictions in 1998 and 2004 for possession and distribution of cocaine. But Jackson, like Brown, claimed that these convictions were not for "serious drug offense[s]."   When those crimes were committed, the Federal Government and Florida defined cocaine the same way.   21 U. S. C. §812(c), Schedule II, (a)(4); Fla. Stat. §§893.03(2)(a)(4), 893.13(1) (1998).   But in 2015,

---

[1] Hemp is exempted if it contains less than 0.3% THC (tetrahydrocannabinol), the main psychoactive constituent of cannabis.   See 7 U. S. C. §1639*o*; 21 U. S. C. §802(16).

the Federal Government legalized a radioactive cocaine derivative called [$^{123}$I]ioflupane that is the active pharmaceutical ingredient in a drug used to diagnose patients who are suspected to have Parkinson's disease. See Schedules of Controlled Substances: Removal of [$^{123}$I]Ioflupane From Schedule II of the Controlled Substances Act, 80 Fed. Reg. 54717. So when Jackson committed his federal offense, the federal and Florida definitions were no longer a categorical match.

The District Court found that Jackson's prior convictions qualified as serious drug offenses and sentenced him to ACCA's mandatory minimum. On appeal, the Eleventh Circuit initially disagreed and vacated Jackson's sentence. 36 F. 4th 1294, 1306 (2022). But a few months later, the panel *sua sponte* vacated its opinion, ordered supplemental briefing, and in a new opinion affirmed the District Court. 55 F. 4th 846, 862 (2022). The Eleventh Circuit reasoned that a prior drug conviction is an ACCA predicate if the state and federal definitions of the drug matched when the defendant committed the state offense. *Id.*, at 854.

We granted Brown's and Jackson's petitions for a writ of certiorari and consolidated the two cases. 598 U. S. —— (2023). We now affirm.

II

A

These cases ask what 18 U. S. C. §924(e)(2) means when it refers to a prior state drug offense "involving . . . a controlled substance . . . as defined in section 102 of the [CSA]," and specifically, whether the federal and state definitions of a drug must match when the state crime is committed or at some later point in time. The parties propose three different answers.

The Government argues that a prior state drug conviction qualifies if the federal and state definitions of the relevant drug matched when the defendant committed the state crime. Therefore, even if the federal and state definitions are different when a defendant violates the federal felon-in-possession law or is sentenced under that law, earlier state

convictions that occurred during the period when the federal and state definitions were the same nevertheless qualify as "serious drug offense[s]."

Jackson, by contrast, argues that the federal and state definitions must match when the defendant violates the federal felon-in-possession statute. In his view, it does not matter whether the federal and state laws both criminalized the relevant drug when a defendant possessed or trafficked in it. If the Federal Government later narrows its definition of that drug, no state conviction under the broader definition counts against a defendant who later commits the federal firearm offense.

This interpretation would mean that Jackson's two cocaine convictions are no longer "serious drug offense[s]" because, years later, the Federal Government narrowed the definition of cocaine in the federal schedules to legalize a Parkinson's drug derived from cocaine. In fact, under Jackson's and the dissent's interpretation, *no* Florida cocaine convictions obtained before July 1, 2017, when Florida also legalized the derivative, would count. See 2017 Fla. Laws ch. 2017–110. That would be true even for convictions involving the possession or distribution of huge shipments of cocaine base.[2] And as other courts have noted, cocaine convictions under the laws of many other States would likewise be affected. See, *e.g.*, *United States* v. *Perez*, 46 F. 4th 691, 698–701 (CA8 2022) (excluding an Iowa conviction under Jackson's theory); *United States* v. *Myrick*, 2023 WL 2351693, *2 (ED Pa., Mar. 2, 2023) (excluding a Pennsylvania conviction).

These cocaine convictions would be excluded even though it is highly unlikely that any were based on the possession

——————
[2] See, *e.g.*, E. Johnson, A Sarasota Drug Sting Brings Results 10 Arrests, and a Million-Dollar Supply of Cocaine Taken Off, Sarasota Herald-Tribune (Feb. 4, 2014), https://www.heraldtribune.com/story/news/2014/02/05/a-sarasota-drug-sting-brings-results-10-arrests-and-a-million-dollar-supply-of-cocaine-taken-off/29227445007; see also Judgment in *State* v. *Gomez*, No. 2014CF001404–004NC (12th Jud. C. C. Sarasota Cty., Fla., Oct. 8, 2015, recorded Oct. 19, 2015).

or sale of the Parkinson's drug. That derivative is radioactive, so it can be produced only through a "highly technical and complex synthetic route," and the drug in which it appears can be stored for no more than 24 hours. Dept. of Justice, Drug Enforcement Admin., Office of Diversion Control, Schedule of Controlled Substances: Removal of [¹²³I]Ioflupane From Schedule II of the Controlled Substances Act: Background, Data, and Analysis 5–6 (2015). Furthermore, anyone attempting to become intoxicated by using the drug would need to inject "nearly 6,000 vials," or "15 liters of fluid, a volume likely to cause death if administered intravenously." *Id.*, at 2. Unsurprisingly, the Federal Government has identified "no case reports" involving individuals who misused that drug, or any other [¹²³I]ioflupane-containing product. *Id.*, at 6.

Brown offers a third option. He contends that the federal and state definitions must match when the defendant is *sentenced* for the federal firearm offense. Under his interpretation, it does not matter whether the two definitions matched when a defendant previously violated state law or even when he or she committed the federal firearm offense. As he sees it, if the federal authorities narrow the definition of a drug at any point before sentencing, the prior state convictions no longer count as ACCA predicates.

This interpretation would produce strange results in cases involving long criminal investigations or prosecutions. In this case, for example, Congress adopted the partial exemption of hemp nearly nine months after Brown was indicted, and more than two years after he violated § 922(g). Under his proposed interpretation, he is exempt from ACCA's mandatory minimum only because his prosecution did not move more quickly.

Indeed, Brown's interpretation could result in very different sentences for co-defendants who committed the same state marijuana offense on the same days and likewise com-

mitted the felon-in-possession offense at the same time.　But see 18 U. S. C. §3553(a)(6) (instructing sentencing courts to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").　Under Brown's interpretation, if one co-defendant was sentenced on December 19, 2018, one day before the Agriculture Improvement Act was signed into law, and the other was sentenced on December 21, the day after enactment, ACCA's 15-year mandatory minimum would apply to the first but not the second.

### B

We must decide which of these three proposed interpretations is correct.　Standing alone, the operative phrase "involving . . . a controlled substance (as defined in [the CSA])" does not definitively answer that question, but precedent and statutory context show that the Government's interpretation is correct.

ACCA is a recidivist statute that gauges what a defendant's "history of criminal activity" says about his or her "culpability and dangerousness." *McNeill* v. *United States*, 563 U. S. 816, 823 (2011).　It does this through a "backward-looking" examination, *id.*, at 820, of "previous convictions" that bear on dangerousness, §924(e)(1).　Thus, as we explained in *McNeill*, ACCA requires sentencing courts to examine the law as it was when the defendant violated it, even if that law is subsequently amended.　*Id.*, at 820–822 (listing cases examining the law at the time of the predicate offense).

In *McNeill*, the question was whether a prior state drug conviction was for a crime that carried the maximum penalty needed to qualify as a "serious drug offense," *i. e.*, imprisonment for 10 years or more.　To answer that question, we looked back to "the law under which the defendant was convicted" and concluded that a subsequent statutory amendment reducing the maximum penalty below the 10-year

threshold did not matter. *Id.*, at 820. This "backward-looking" approach supports the Government's interpretation here.

The plain language of 18 U. S. C. § 924(e)(2)(A)(i), the provision that immediately precedes the provision at issue here, § 924(e)(2)(A)(ii), points to the same conclusion. Section 924(e)(2)(A)(i) defines a "serious drug offense" to include certain federal drug crimes, namely, "offense[s] *under* the Controlled Substances Act (21 U. S. C. § 801 et seq.)" or two other federal laws. (Emphasis added.) Any crime contained in the CSA is an offense "under the [CSA]." The standard "Judgment in a Criminal Case" used in federal courts indicates whether a defendant was convicted and sentenced for such an offense,[3] and a later change in a federal drug schedule cannot change that fact. The Government's interpretation would treat state offenses "involving . . . a controlled substance (as defined in [the CSA])" like those federal offenses "under the [CSA]." § 924(e)(2).

Petitioners' interpretations, by contrast, would treat those federal and state offenses differently. Consider a defendant who was caught distributing cocaine on back-to-back days, was charged with a federal crime for the first day's offense and an identical state crime for the second, and was convicted of both before the 2015 amendment that deleted the Parkinson's drug from the definition of cocaine. Under petitioners' interpretations, the federal offense would remain an ACCA predicate, but the state offense would not, even though the crimes and the statutes of conviction were otherwise identical.

That is a very strange reading of §§ 924(e)(2)(A)(i) and (ii). Both clauses refer to prior offenses relating to the CSA, and in § 924(e)(2)(A)(i) Congress clearly indicated that past conduct that violated the CSA is probative of a defendant's "culpability and dangerousness," *McNeill*, 563 U. S., at 823, even

---

[3] See https://www.uscourts.gov/sites/default/files/ao245b.pdf.

if the federal drug schedule is later amended. There is no reason to think Congress reached a different judgment as to petitioners' conduct merely because they had been convicted under a state, rather than federal, statute. Indeed, it would be unnatural to give back-to-back references to the CSA starkly different interpretations. See, *e. g.*, *Brown* v. *Gardner*, 513 U. S. 115, 118 (1994); *Ratzlaf* v. *United States*, 510 U. S. 135, 143 (1994).[4]

C

The Government's interpretation also best fulfills ACCA's statutory objectives. Congress's "general approach" in ACCA was to single out "offenses of a certain level of seriousness that involve violence or an inherent risk thereof, and that are likely to be committed by career offenders." *Taylor* v. *United States*, 495 U. S. 575, 590 (1990). Because defendants who have repeatedly committed ACCA predicate offenses are "especially likely to inflict grave harm when in possession of a firearm," ACCA imposes a higher punishment when they do so. *Wooden* v. *United States*, 595 U. S. 360, 375 (2022); *United States* v. *Rodriquez*, 553 U. S. 377, 385 (2008) ("[A] second or subsequent offense is often regarded as more serious because it portends greater future danger and therefore warrants an increased sentence for purposes of deterrence and incapacitation"). A defendant's "history of criminal activity" does not "cease to exist" merely because

---

[4]Jackson argues that reading 18 U. S. C. §924(e)(2) to refer to the past would be inconsistent with other statutory references to the CSA that "must incorporate the CSA schedules at the time of the federal offense." Brief for Petitioner Jackson 14. For example, he points to §924(g)(3), which criminalizes cross-border travel to obtain a firearm intended for use in a state offense "relating to any controlled substance (as defined in [the CSA])," and §342, which prohibits the operator of a common carrier from operating under the influence of "any controlled substance (as defined in [the CSA])." But those statutes focus entirely on present-day conduct, while ACCA refers to "previous convictions." §924(e)(1). Because ACCA is concerned with recidivism, it is not inconsistent to read it differently.

the crime was later redefined. *McNeill*, 563 U. S., at 823.
It therefore makes sense to ask, as the Government does,
whether a prior offense met ACCA's definition of serious-
ness—and thus suggested future danger—at the time it
was committed.

Petitioners and the dissent disagree. As Brown puts it,
when the Federal Government "changes the federal drug
schedules," it "necessarily conclude[s]" that the de-scheduled
substance "does not implicate the culpability or harm that
federal law previously attributed to it." Reply Brief for
Petitioner Brown 1 (emphasis deleted). Of course, Brown
and Jackson were themselves convicted of crimes involving
substances that are still on the federal schedules, marijuana
and cocaine, not hemp or [$^{123}$I]ioflupane.[5] But even setting
that aside, their argument misunderstands the theory on
which ACCA is based.

A prior drug conviction for an offense punishable by 10
years' imprisonment augurs a risk of future dangerousness
even if the drug is no longer considered dangerous. That is
because the conviction reveals that the defendant previously
engaged in illegal conduct that created a dangerous risk of
violence, either with law enforcement or with others operat-
ing in the same illegal field. If left at large, such defendants
present a serious risk to public safety.

That risk "does not cease to exist" if the law under which
the defendant was convicted is later amended or eliminated.
*McNeill*, 563 U. S., at 823. For example, consider a person
who distributed alcohol during Prohibition. The later legal-
ization of alcohol did not by any means ensure that these
bootleggers would take up legitimate jobs. Instead, after

_____

[5] Latching onto this sentence, the dissent spends three pages accusing
us of departing from the categorical approach. *Post*, at 133–135 (opinion
of JACKSON, J.). The dissent attacks a strawman. We agree that our
precedents require us to ask whether a defendant's prior conviction
matches ACCA's requirements. *Post*, at 133–134. The question here is
*what* ACCA requires.

the end of Prohibition, many of them simply shifted to other illegal enterprises. See S. Morison, The Oxford History of the American People 901 (1965) (Prohibition led to "the building up of a criminal class that turned to gambling and drugs" after the Eighteenth Amendment was repealed). Likewise, Brown's and Jackson's multiple convictions for serious drug crimes are evidence that they may continue to "'commit a large number of fairly serious crimes as their means of livelihood'" in the future. *Wooden*, 595 U. S., at 375 (quoting *Taylor*, 495 U. S., at 587). And that risk remains true despite the technical changes to the federal drug schedules on which their arguments hang.

For this reason, the Court has previously rejected similar arguments about ACCA's rationale. Like petitioners here, the petitioner in *McNeill* argued that a later reduction in the maximum sentence for his offense reflected a legislative judgment that his prior offense was less serious than previously thought. Brief for Petitioner, O. T. 2010, No. 10–5258, pp. 15, 35. And this, he suggested, meant that the offense should no longer be treated as "serious" under ACCA. We termed that argument "absurd." *McNeill*, 563 U. S., at 822. The "subsequent chang[e] in state law" did not "erase [the] earlier conviction." *Id.*, at 823. And it was the fact of that earlier conviction—not the legislature's subsequent judgment—that ACCA was concerned with, because that fact "demonstrate[d]" the defendant's "culpability and dangerousness." *Ibid.*

## III

Petitioners and the dissent make various other arguments, but none is persuasive.

### A

#### 1

Jackson mainly relies on two interpretive tools. He begins with the so-called reference canon. Brief for Petitioner Jackson 31. This canon, he claims, means that ACCA "in-

corporates [the] schedules . . . 'as [they] exis[t] whenever a question under [ACCA] arises.'" *Id.*, at 32 (quoting *Jam* v. *International Finance Corp.*, 586 U. S. 199, 209 (2019)). "And," he says, "the first time a 'question arises' under ACCA is when a person commits [a] federal firearm offense." Brief for Petitioner Jackson 32.

The reference canon can be a helpful tool, but Jackson misuses it. That canon provides that a statutory reference to a "*general* subject" incorporates "the law on that subject as it exists whenever a question under the statute arises." *Jam*, 586 U. S., at 209 (emphasis added). But a reference "to another statute by specific title or section number"—such as ACCA's reference to 21 U. S. C. §802—"in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, *without any subsequent amendments*." 586 U. S., at 209–210 (emphasis added). *That* part of the reference canon undermines Jackson's position.

Jackson attempts to rescue his argument by asserting that ACCA's mention of the CSA is actually a "general reference." Reply Brief for Petitioner Jackson 15. To support this argument, he cites cases that treat statutes as adopting "the general law on [a] subject," even though the statutes "referred to" that general law "in terms of the sections of the statutes in which it is to be found." *George Williams College* v. *Williams Bay*, 242 Wis. 311, 316, 317, 7 N. W. 2d 891, 894 (1943). But even if we assume that there may be contexts in which references to specific statutory provisions may be considered "general," see, *e. g.*, *Matter of Commitment of Edward S.*, 118 N. J. 118, 134, n. 9, 570 A. 2d 917, 925, n. 9 (1990), it is hard to see the phrase "as defined in section 102 of the Controlled Substances Act" as anything but a specific reference. 18 U. S. C. §924(e)(2)(A)(ii).

And for reasons already set out, the "context" here does not help Jackson. As we have explained, his reading would treat a state offense involving a "controlled substance . . . defined in [the CSA]" differently from a federal offense

"under the [CSA]," even though both phrases make reference to the same Act. *Supra*, at 112–113. That approach would give defendants with prior state offenses the benefit of subsequent amendments to the CSA but would ignore those same amendments for prior federal offenses. In that context, Jackson's reliance on the reference canon is clearly unpersuasive.

Alternatively, Jackson says that his reading is required by the "settled legal principle" that "the law that sets the penalty for a federal crime is the law in place when the crime was committed." Brief for Petitioner Jackson 17 (citing *Dorsey* v. *United States*, 567 U. S. 260, 272–273 (2012)). And to show that this principle supports his reading of § 924(e)(2)(A)(ii), he offers a series of hypotheticals involving amendments to ACCA. Brief for Petitioner Jackson 18–20. Here is one. If Congress deleted drug possession from the list of "serious drug offense[s]," he argues, no one would think that someone who "commit[ted] a federal firearm offense after this change . . . would be subject to ACCA based on a prior state conviction" for drug possession. *Id.*, at 18. Therefore, he maintains, the same should be true for amendments to the schedules.

This argument begs the question that these cases present, which is whether § 924(e)(2)(A)(ii) is amended with every change in the drug schedules. Jackson imagines a version of ACCA that plainly would not apply to a prior state offense because that version would no longer list drug possession as a "serious" offense, and he then reasons that the same result should obtain here. But in his hypothetical, § 924(e) was amended. Here, only the federal drug schedules were changed. Jackson's argument that a change in the federal drug schedules equates to a change in § 924(e)(2)(A)(ii) is thus nothing more than his reference-canon argument dressed in different garb. And for the reasons we have explained, we are convinced that the canon does not work in the way he suggests.

In all events, Jackson's emphasis on "the law in place when the crime was committed" is a red herring. Section 924(e)(2)(A)(ii) currently means that a prior state drug conviction may constitute an ACCA predicate if the drugs on the federal and state schedules matched when the state drug offense was committed. Thus, contrary to Jackson's suggestion, treating his prior convictions as ACCA predicates is entirely consistent with the "settled legal principle" that current law "sets the penalty for a federal crime." *Id.*, at 17.

2

The dissent agrees with Jackson's interpretation but for a different reason. It believes that *all* cross-references "plug [in] the referenced provision" as it exists at the time of the statute's interpretation. *Post*, at 126 (opinion of Jackson, J.). Thus, ACCA's reference to the CSA must incorporate "the current federal drug schedules—*i.e.*, those in effect at the time of the federal offense." *Post*, at 125–126.

The problem for the dissent is that none of the cases it cites supports this proposition. See *Yellen* v. *Confederated Tribes of Chehalis Reservation*, 594 U. S. 338, 344–348 (2021); *Astrue* v. *Capato*, 566 U. S. 541, 547–549 (2012); *Carachuri-Rosendo* v. *Holder*, 560 U. S. 563, 566–570 (2010); *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 8–9 (2010). For good reason: as we have explained, cross-references sometimes refer to the law as it currently exists, but they may also incorporate a referenced statute as it existed when the cross-reference was enacted. *Supra*, at 116. Indeed, many of the dissent's cases stand for the unobjectionable proposition that courts must carefully consider the text and context of each statute before adopting a one-size-fits-all approach to cross-references. See *Herrmann* v. *Cencom Cable Assoc.*, *Inc.*, 978 F. 2d 978, 983 (CA7 1992) (attempting to "do the least damage" to unravel "contradictory enact-

ments"); *United States* v. *Head*, 552 F. 3d 640, 645 (CA7 2009) (rejecting a "categorical rule" for "statutory cross-references"); *United States* v. *Ho*, 984 F. 3d 191, 202 (CA2 2020) (rejecting a reference-canon argument inconsistent with plain language).

Following the approach laid out by the dissent's cases thus brings us back to the question with which we started: What is the best reading of ACCA's cross-reference in light of context, precedent, and statutory purpose?  *Supra*, at 111.  For the reasons we have explained, it is that a prior state drug conviction constitutes an ACCA predicate if the drugs on the federal and state schedules matched when the state drug offense was committed.

B

We turn next to Brown's interpretation, which would require the state and federal definitions to match when the defendant is sentenced for a federal firearm offense.  Brown first argues that his interpretation is grounded in ACCA's text because it focuses on the "here-and-now import" of "historical facts."  Brief for Petitioner Brown 8.  Specifically, Brown notes that ACCA uses the "*present* participle of 'involve,'" rather than "the past participle."  Reply Brief for Petitioner Brown 2–3.  And he suggests that the phrase "'as defined in'" is likewise in the present tense.  *Id.*, at 3.

Unfortunately for Brown, we have already rejected this textual argument.[6]  The petitioner in *McNeill* likewise argued that the present-tense language in ACCA's definition of a "serious drug offense" indicated a present-day focus.  563 U. S., at 820.  Citing that language, he asked the Court to require federal courts to "loo[k] to the state law in effect at the time of the federal sentencing," *ibid.*, but we declined

_____

[6] The dissent makes a similar textual argument but does not grapple with our reasoning in *McNeill* v. *United States*, 563 U. S. 816 (2011).  See *post*, at 128, and n. 2.

to do so. Because "ACCA is concerned with convictions that have already occurred," we held that it requires a historical inquiry into the state law at the time of that prior offense. *Ibid.* And the "[u]se of the present tense . . . d[id] not suggest otherwise." *Ibid.*

*McNeill*'s conclusion makes sense. Use of the present tense, as opposed to the past, was likely a stylistic rather than a substantive choice. Around the time of ACCA's enactment, legislative drafters were instructed, "[w]henever possible," to "use the present tense (rather than the past or future)." House Office of the Legislative Counsel, Style Manual; Drafting Suggestions for the Trained Drafter § 102(c), p. 2 (1989); see also D. Hirsch, Drafting Federal Law § 5.6, p. 45 (2d ed. 1989) ("Various commentators on drafting have tried, over the years, to persuade drafters to use the present tense . . . "). So, at least in the instant context, we cannot place too much weight on the use of the present tense as opposed to the past.

Brown also claims that his reading is required by *United States* v. *Schooner Peggy,* 1 Cranch 103 (1801), which says that when the law changes while a case is in progress, the case must be decided under the new law.[7] *Id.,* at 110. But that principle does nothing to advance Brown's position. Section 924(e)(2)(A)(ii) has not changed at any point in the litigation, from the time petitioners committed their federal offenses until today. Then, as now, under § 924 past state drug possession offenses may qualify as ACCA predicates if the federal and state schedules matched when the state crimes occurred.

_____

[7] Brown also likens his interpretation to the "ordinary practice" of applying Guidelines sentencing enhancements as they exist at sentencing. Tr. of Oral Arg. 4. But there is reason to doubt that the Guidelines practice is relevant here. That is because Congress has expressly directed courts to apply the Guidelines "in effect on the date the defendant is sentenced." 18 U. S. C. § 3553(a)(4)(A)(ii). ACCA contains no similar instruction.

C

We conclude by addressing some additional arguments advanced by both petitioners. First, they assert that our interpretation should be rejected because it is under-inclusive—specifically, because it would preclude ACCA enhancements for state offenses involving drugs added to the federal lists only after the state crimes were committed. But none of the parties' interpretations captures all cases involving career criminals. Indeed, Brown and Jackson are themselves asking to be exempted from ACCA's reach even though they both have a history of dealing drugs that remain prohibited by federal law.

Second, petitioners suggest that the Government's interpretation is absurd because it "would exclude from ACCA's reach all state drug convictions from before 1970" when the CSA was enacted. Brief for Petitioner Jackson 33; accord, Brief for Petitioner Brown 16. But whether or not this consequence is desirable, it is not absurd.

We can easily see a reason why Congress might have chosen not to count either federal or state drug convictions that occurred before 1970. Before that time, "Congress ha[d] enacted more than 50 pieces of legislation relating to . . . dangerous drugs," and this had "given rise to a confusing and often duplicative approach to . . . enforcement." H. R. Rep. No. 91–1444, pt. 1, p. 6 (1970). The CSA was designed to replace these scattered provisions "with a single comprehensive statute." Cong. Research Serv., L. Sacco, Drug Enforcement in the United States: History, Policy, and Trends 5 (2014). It was reasonable for Congress to peg ACCA's penalties to that new comprehensive regulatory scheme rather than requiring courts to grapple with the welter of federal drug laws that previously existed.

Petitioners argue that the Government's interpretation would unduly burden courts and defendants by requiring them to undertake the laborious task of digging up old federal drug schedules and comparing those to the state laws

the defendants violated. But the difficulty of this task is overstated. Most drug convictions concern just a few drugs, and the federal and state definitions of those drugs do not often change. In the cases now before us, the courts below had no apparent difficulty finding the needed information.

Finally, both petitioners contend that the rule of lenity counsels us to adopt their interpretations. It does not. Lenity applies only if a statute remains grievously ambiguous after we have consulted "'everything from which aid can be derived.'" *Pugin* v. *Garland*, 599 U. S. 600, 610 (2023) (quoting *Ocasio* v. *United States*, 578 U. S. 282, 295, n. 8 (2016)). As we have explained, however, context, precedent, and statutory design adequately show "'what Congress intended.'" *United States* v. *Castleman*, 572 U. S. 157, 173 (2014) (quoting *Barber* v. *Thomas*, 560 U. S. 474, 488 (2010)).

In any event, neither Jackson's nor Brown's interpretation would be preferable for all defendants. Both interpretations could hurt defendants who committed or were sentenced for the felon-in-possession offense before the addition of a drug to the federal schedules. As petitioners' own briefs highlight, States sometimes criminalize drugs before the Federal Government does so. See Brief for Petitioner Jackson 34–35; Brief for Petitioner Brown 17. For instance, Florida banned the stimulant known as bath salts 10 months earlier than the Federal Government.[8] And Utah criminalized the hallucinogen methoxetamine nearly a decade before the Federal Government followed suit. See

---

[8] Florida Bans 'Bath Salt' Drugs After Violent Outbursts, Sun Sentinel (Jan. 27, 2011), https://www.sun-sentinel.com/2011/01/27/florida-bans-bath-salt-drugs-after-violent-outbursts; Press Release, Dept. of Justice, Drug Enforcement Admin., Chemicals Used in "Bath Salts" Now Under Federal Control and Regulation (Oct. 21, 2011), https://www.dea.gov/press-releases/2011/10/21/chemicals-used-bath-salts-now-under-federal-control-and-regulation.

2013 Utah Laws ch. 88; Schedules of Controlled Substances: Placement of Methoxetamine (MXE) in Schedule I, 87 Fed. Reg. 34166 (2022). State convictions for those drugs that predate the federal amendments would not count as ACCA predicates under the Government's interpretation but may under petitioners' interpretations. It would be odd to use the rule of lenity to help petitioners but harm others.

\*　　\*　　\*

For these reasons, we hold that a state drug conviction counts as an ACCA predicate if it involved a drug on the federal schedules at the time of that offense. Accordingly, we affirm the judgments of the Courts of Appeals.

*It is so ordered.*

JUSTICE JACKSON, with whom JUSTICE KAGAN joins, and with whom JUSTICE GORSUCH joins as to Parts I, II, and III, dissenting.

The Court maintains that, "[s]tanding alone," the text of 18 U. S. C. § 924(e)(2)(A)(ii) "does not definitively answer" the question presented in these cases. *Ante,* at 111. Instead, says the majority, we must look beyond the text to precedent, statutory context, and purpose—which apparently converge to persuade the majority that § 924(e)(2)(A)(ii) requires sentencing courts to apply the drug schedules in effect at the time of a defendant's prior state drug conviction when determining the applicability of the 15-year mandatory minimum in the Armed Career Criminal Act (ACCA). But the relevant text *does* definitively answer the question presented here. And it establishes that courts should apply the drug schedules in effect at the time of the federal firearms offense that triggers ACCA's potential application. Nothing else— not precedent, context, or purpose—requires a different result. Therefore, I respectfully dissent.

## I

### A

As relevant here, ACCA imposes a 15-year mandatory minimum for defendants who commit a violation of § 922(g) while having "three previous convictions . . . for . . . a serious drug offense." 18 U. S. C. § 924(e)(1). Notably, Congress did not leave unanswered the question of *which* prior state convictions qualify as "a serious drug offense" for ACCA purposes. Rather, ACCA expressly defines the term "serious drug offense" by direct reference to another federal law. To qualify as a "serious drug offense," the prior state crime must be one "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U. S. C. [§ ]802))." § 924(e)(2)(A)(ii).

The dispute in these cases arises from the fact that the meaning of the term "controlled substance"—as defined by federal law—can, and frequently does, change. Under the Controlled Substances Act, a controlled substance is "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V." 21 U. S. C. § 802(6). Those five schedules, which are not contained in the statute itself, are lists of substances that are "updated and republished on an annual basis" by the Attorney General. § 812(a). During this annual review, the Attorney General may add or remove drugs from the schedules based on various considerations, such as a drug's "actual or relative potential for abuse" or the "state of current scientific knowledge regarding the drug." § 811(c); see also, *e.g.*, 21 CFR pt. 1308 (2023) (setting forth the most recent drug schedules). Congress itself can also categorically remove substances from the schedules. See, *e.g.*, 21 U. S. C. § 802(16)(B) (excluding hemp from the schedules).

By directing that the term "controlled substance" in ACCA be determined on the basis of the Controlled Sub-

stances Act's definition—which itself references the federal drug schedules—Congress has opted to rely on a federal statute that contains its own cross-reference to a dynamic list of prohibited substances. ACCA's "serious drug offense" definition thus incorporates those oft-changing drug schedules by reference.

B

The majority and I are in full agreement that, consequently, a sentencing court deciding whether to impose ACCA's 15-year mandatory minimum for a violation of §922(g) must consult those external drug schedules to determine whether the drug "'involv[ed]'" in a prior state offense is a controlled substance under federal law. See *ante*, at 105–106. Yet, somehow, the majority concludes that the pertinent drug schedules for ACCA's sentencing exercise are those that were in effect when the prior state drug crime occurred. In my view, a straightforward application of the aforementioned statutory text plainly establishes otherwise.

First of all, ACCA expressly defines "serious drug offense," §924(e)(2)(A), and "[w]hen a statute includes an explicit definition, we must follow that definition," *Burgess* v. *United States*, 553 U. S. 124, 130 (2008) (internal quotation marks omitted). Congress could have defined "serious drug offense" based solely on state law. It did not. Instead, Congress made clear that only state drug crimes that involve substances that qualify as "controlled substance[s]" under the Controlled Substances Act are sufficiently serious to warrant ACCA's penalty.

Second, the definition of "serious drug offense" that appears in ACCA *cross-references* the highly mutable federal drug schedules—a drafting device that does particular work in the legislative context. Consistent with the operation of cross-references elsewhere, the cross-reference in ACCA's "serious drug offense" definition necessarily directs sentencing courts to consult the current federal drug schedules—

*i. e.*, those in effect at the time of the federal offense for which the defendant is being sentenced—rather than some earlier version of those lists.

That is, quite simply, how cross-references work. When it comes time to interpret a statute, courts typically plug the referenced provision, as they find it, into the statutory text. They do not consider, much less account for, any amendments that might have taken place over the course of the referenced provision's existence. Nor does it matter that the referenced statute is a separate pronouncement that has its own legislative history and course of development.

Courts proceed in this straightforward plug-and-play manner with respect to statutory cross-references because "the presumed temporal application of a statute" is when "the relevant activity that the [statute] regulates" occurs. *Landgraf* v. *USI Film Products*, 511 U. S. 244, 291 (1994) (Scalia, J., concurring in judgments). That presumption applies with full force to any provisions cross-referenced in a statute, because "incorporating one statute or system of statutes into another . . . serves to bring into the latter all that is fairly covered by the reference." *Panama R. Co.* v. *Johnson*, 264 U. S. 375, 392 (1924). And what is fairly covered is the referenced law as it exists when the statute's application is required. See *Landgraf*, 511 U. S., at 291.

Until today, that had been our consistent practice. See, *e.g.*, *Yellen* v. *Confederated Tribes of Chehalis Reservation*, 594 U. S. 338, 344–348 (2021) (applying the cross-referenced definition then in effect); *Astrue* v. *Capato*, 566 U. S. 541, 547–549 (2012) (same); *Carachuri-Rosendo* v. *Holder*, 560 U. S. 563, 566–570 (2010) (same); *Holder* v. *Humanitarian Law Project*, 561 U. S. 1, 8–9 (2010) (same). When a statute contains a cross-reference to another provision, we have always simply applied the version of the other provision in effect at the time the cross-referenced provision was needed, even if Congress amended that provision at some point in the past.

JACKSON, J., dissenting

Of course, this way of interpreting statutes with cross-references means that a change in the referenced provision has the effect of changing the statute that contains the cross-reference. But that is a feature, not a bug, of statutory cross-references. In fact, Congress often uses the cross-reference device in a statute "*precisely because* the [referenced provision] may be amended." *Herrmann* v. *Cencom Cable Assoc., Inc.*, 978 F. 2d 978, 983 (CA7 1992) (Easterbrook, J.) (emphasis added). Far from being problematic, one useful feature of a statutory cross-reference from the standpoint of the legislative drafter is that it "permits the effect of a change in one section to propagate to other, related, sections without rewriting all of those related sections." *Ibid.*

That basic understanding of how cross-references work easily resolves these cases. ACCA mandates that, for the purpose of its "serious drug offense" definition, a "controlled substance" must be determined in accordance with the Controlled Substances Act, 18 U. S. C. §924(e)(2)(A)(ii), and the Controlled Substances Act, in turn, looks to the substances on the drug schedules, 21 U. S. C. §802(6). Congress's incorporation of the drug schedules by cross-reference in this manner means that a sentencing court must plug in the drug schedules as it finds them based on when "the relevant activity that the [statute] regulates" occurs. *Landgraf*, 511 U. S., at 291. For ACCA, as with other federal criminal statutes, that means the court must apply the drug schedules in effect when the defendant "commits the underlying conduct that makes the offender liable." *Dorsey* v. *United States*, 567 U. S. 260, 272 (2012).[1]

_____

[1] Brown argues that, as a sentencing statute, ACCA incorporates the drug schedules that are in effect when a District Court gives legal effect to its provisions—*i.e.*, at the time of the federal sentencing. See *ante*, at 119. While Congress determined that the Sentencing Guidelines should follow that approach, see 18 U. S. C. §3553(a)(4)(A)(ii), we have recognized that the so-called federal saving statute, 1 U. S. C. §109, generally requires

To be sure, one consequence of this approach is that, as the drug schedules change, so does the meaning of "controlled substance" under ACCA. See *Herrmann*, 978 F. 2d, at 983. But, again, Congress seems to have intended that result, insofar as the statute it wrote pegs ACCA's "serious drug offense" definition to lists of substances that the Attorney General is required to revisit on an annual basis. Indeed, Congress presumably chose to cross-reference those drug lists (rather than copying them directly into ACCA) precisely because of their dynamic nature.

The fact that ACCA's "serious drug offense" definition uses the present tense, as the majority concedes, see *ante*, at 120, further bolsters the conclusion that Congress was consciously incorporating the annual updates that the federal drug schedules embody. As we have previously recognized, "the present tense generally does not include the past." *Carr* v. *United States*, 560 U. S. 438, 448 (2010). If Congress had wanted to reference a past version of the drug schedules, it easily could have indicated as much in the text of ACCA. But Congress used the present tense instead, directing sentencing courts to look to the meaning of "controlled substance" in effect when a defendant commits the federal crime requiring ACCA's application, not at some previous point in time.[2]

_____

courts to apply the criminal statutes in effect at the time the defendant committed the federal crime, see *Dorsey*, 567 U. S., at 272. Only Jackson's approach is consistent with that precedent. See *ante*, at 109.

[2] The majority attributes ACCA's use of the present tense to a mere "stylistic" choice by Congress, relying primarily on a contemporaneous legislative drafting manual as support for that conclusion. *Ante*, at 120. But the wholly speculative suggestion that ACCA's drafters actually relied on the cited manual's tense-related directives conveniently comes out of nowhere. Moreover, to the extent the majority now believes that verb tense is irrelevant when a court undertakes to interpret the text of a statute, it has taken a strange and unwarranted departure from this Court's ordinary interpretive practices. Before today, we have consist-

JACKSON, J., dissenting

## II

The Government rejects the foregoing description of how statutory cross-references operate. Tr. of Oral Arg. 58 (expressing "disagree[ment] that the background rule is that we always look to the contemporaneous referenced law"). The Government insists that, instead of merely calling for insertion of the referenced law, the appearance of a cross-reference in a statute "raises a temporal question" that requires a court to determine "which version of [the cross-referenced provision] Congress intend[ed] to reference." *Id.*, at 56. As the Government sees it, every statutory cross-reference can thus have "different temporal branches depending on context." *Id.*, at 58; see also *ante*, at 119 (appearing to adopt this temporally flexible approach to cross-references).

That cannot be right. We have never viewed statutory cross-references as a gateway to the multiverse. Cf. *Clark* v. *Martinez*, 543 U. S. 371, 382 (2005) (rejecting an approach that "would render every statute a chameleon"). No case that I am aware of has ever asked whether some past version of the statute applies when the court is interpreting a provision that contains a cross-reference—and neither the majority nor the Government cites any. In fact, our actual practices establish the contrary. Whenever we have addressed a statutory cross-reference, we have always taken the same tried-and-true approach that we employ with respect to stat-

_____

ently used all aspects of a statute's text to ascertain its meaning, including the verbs that Congress chooses. See, *e. g., Barton* v. *Barr*, 590 U. S. 222, 236 (2020); *Carr* v. *United States*, 560 U. S. 438, 448 (2010); *United States* v. *Wilson*, 503 U. S. 329, 333 (1992); *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 57 (1987). An objection to this approach has surfaced only once before, in dissent. See *Carr*, 560 U. S., at 462–464 (opinion of ALITO, J.) (relying on legislative drafting manuals to suggest that the tense of the verbs in a statute was not relevant to the provision's interpretation).

utory definitions: We plug in the referenced provision as it exists at the moment the statute's provisions become applicable. See Part I–B, *supra.*

Any other approach risks chaos. Again, Congress often uses cross-references in statutes "precisely because the [referenced provision] may be amended," thereby allowing that amendment "to propagate to other, related, sections without rewriting all of those related sections." *Herrmann*, 978 F. 2d, at 983. The Government's view would unsettle that longstanding drafting convention, injecting uncertainty into what Congress must do to amend statutes using cross-references. What is more, if every cross-reference raised a question about which version of the referenced statute applies—past or present—interpretation of federal statutes with cross-references would become entirely unworkable. Cross-references are legion in the U. S. Code, and cross-referenced statutes are regularly amended. Under the Government's approach, every one of those amendments would become a jump ball, inviting competing interpretations about which version of the referenced statute applies.

The Government claims that this disordered way of applying cross-references stems from the so-called reference canon, which sometimes directs courts to apply a past version of a referenced statute. See Tr. of Oral Arg. 56, 58.[3]

---

[3] The reference canon has two strains, general and specific. First, "when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises." *Jam* v. *International Finance Corp.*, 586 U. S. 199, 209 (2019). Second, when there is "a statute that refers to another statute by specific title or section number," that cross-reference "in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments." *Id.*, at 209–210; see also *Hassett* v. *Welch*, 303 U. S. 303, 314 (1938). It is not clear that this latter, specific form of the canon even applies in the absence of uncertainty about what, exactly, is being cross-referenced, such as "a facial defect with the cross-reference or target statute being interpreted." *United States* v. *Head*,

JACKSON, J., dissenting

But even if the reference canon applies under these circumstances, it seems to cut against the Government's interpretation. The Government asserts that, because ACCA references a specific section—"section 102 of the Controlled Substances Act," 18 U. S. C. § 924(e)(2)(A)(ii)—the reference canon "would suggest that the ACCA incorporated the schedules as they existed in 1986, when the cross-reference was enacted." Brief for United States 42. But conspicuously missing from this discussion (as well as the majority's discussion of the reference canon, see *ante*, at 115–116) is the actual text of the cross-referenced provision at issue in these cases, which comes nowhere near incorporation of a static, historical list of substances.

Instead, as explained above, ACCA's "serious drug offense" definition cross-references § 102 of the Controlled Substances Act, see 18 U. S. C. § 924(e)(2)(A)(ii), and under that provision, a "controlled substance" is "a drug or other substance, or immediate precursor, *included in schedule I, II, III, IV, or V*," 21 U. S. C. § 802(6) (emphasis added). This juxtaposition turns what appears to be a specific statutory reference into a more general one, since it is impossible to determine which substances fall under the statutory definition without knowing what the five schedules contain. And because those schedules are designed to change over time, it is hard to view ACCA's reference to the controlled substances definition of the Controlled Substances Act as anything other than an instruction for courts to consult "an external body of potentially evolving law" and "adop[t] the law on that subject as it exists whenever a question under the statute arises." *Jam* v. *International Finance Corp.*, 586 U. S. 199, 209–210 (2019).

---

552 F. 3d 640, 647 (CA7 2009) (collecting cases); see also *United States* v. *Ho*, 984 F. 3d 191, 202 (CA2 2020) (forgoing "unnecessary resort to the reference canon" and instead interpreting the statute consistent with its plain language).

The upshot is that proper application of the reference canon here leads to the same conclusion that I reached above. The cross-reference in ACCA incorporates drug schedules that are updated annually and does so in the present tense, thereby requiring sentencing courts to merely plug in the drug schedules in effect at the time of the defendant's federal firearms offense—*i. e.*, the relevant timeframe for the purpose of the court's interpretation of ACCA's "serious drug offense" language.

## III

In rejecting the typical, straightforward understanding of ACCA's cross-reference, the majority pivots away from the text of the statute entirely, and purportedly bases the Court's conclusion on "precedent and statutory context." *Ante,* at 111. Neither our precedents nor the context of this statute actually compels a different conclusion than the text does, for the reasons explained below.

### A

To start, the majority misreads our precedent. In *Mc-Neill* v. *United States*, 563 U. S. 816 (2011), we considered how to determine whether a state drug crime involved "a maximum term of imprisonment of ten years or more" under state law. §924(e)(2)(A)(ii). *McNeill* instructed sentencing courts making this determination to undertake a "backward-looking" inquiry by "consult[ing]" "the law under which the defendant was convicted"—that is, "the version of state law that the defendant was actually convicted of violating." 563 U. S., at 820–821.

The majority contends that this same "'backward-looking'" approach should apply to the federal drug schedules. *Ante,* at 111–112 (quoting *McNeill*, 563 U. S., at 820). But the federal drug schedules are not "the law under which the defendant was convicted." *Id.*, at 820. And of course *Mc-Neill* was "backward-looking"; any inquiry into a defendant's

statute of conviction is necessarily so. Here, both the Government and petitioners take as a given "the version of state law that the defendant was actually convicted of violating," as *McNeill* instructs. *Id.*, at 821. The question presented in these cases—on which the parties disagree—is how to evaluate whether that prior state-law conviction qualifies as a "serious drug offense" under federal law.

In other words, *McNeill* asked what state crime the defendant committed, while today's cases ask how ACCA assesses that conviction. The latter is an entirely distinct inquiry. And for all the reasons discussed above, the federal benchmark that Congress has selected is not "backward-looking" in the least—it rationally incorporates the currently applicable drug schedules, not ones from the past. See Part I, *supra.*

The majority's opinion not only misconstrues *McNeill*, it also flatly contradicts other precedents from this Court outlining how to determine whether a prior state conviction qualifies as an ACCA predicate. See, *e. g.*, *Mathis* v. *United States*, 579 U. S. 500, 504 (2016); *Taylor* v. *United States*, 495 U. S. 575, 599–602 (1990). As the majority only scantly mentions, to determine whether a state crime is a "serious drug offense," courts are not supposed to rely on the actual or alleged facts related to the prior state drug crime. Rather, they ask "if the State's definition of the drug in question 'matche[s]' the definition under federal law." *Ante,* at 106 (quoting *Shular* v. *United States*, 589 U. S. 154, 158 (2020); alteration in original). We have referred to this matching process as the "'categorical approach.'" *Id.*, at 157 (quoting *Taylor*, 495 U. S., at 600).

Under that methodology, "[a] court must look only to the state offense's elements, not the facts of the case or labels pinned to the state conviction." *Shular*, 589 U. S., at 160. Thus, we do not ask how the State classified or categorized the prior offense. Nor does it matter what type of drug a

defendant actually manufactured, possessed, or sold.   Such facts are "extraneous to the crime's legal requirements," and "ACCA, as we have always understood it, cares not a whit about them."   *Mathis*, 579 U. S., at 504.   Properly applied, the categorical approach mandates that a court's sole focus must be on identifying the state crime's statutory elements and determining whether they categorically match the ACCA predicate.

By appearing to fixate on the facts of petitioners' prior state drug offenses, the majority's opinion thus diverges from our precedents.   For example, the majority puzzlingly suggests that our standard methodology for assessing state crimes in relation to federal law provides a loophole for these petitioners, because "Brown and Jackson were themselves convicted of crimes involving substances that are still on the federal schedules, marijuana and cocaine, not hemp or [123I]ioflupane."   *Ante*, at 114.   But, again, the entire point of the categorical approach is that courts may consider only the state crime's elements, not the substances actually involved in that crime, when undertaking to determine whether the state crime matches the federal standard.

This matters because ensuring adherence to the categorical approach, which the majority fails to do here, serves important objectives.   We employ the categorical approach not only because Congress commanded it, see *Taylor*, 495 U. S., at 589, but also because it "avoids unfairness to defendants," *Mathis*, 579 U. S., at 512, who may not have sought to have the state records accurately reflect the details of the crime they committed.

Suppose, for example, that Brown—whose conviction was reportedly for marijuana—was, in fact, prosecuted by the State for conduct involving hemp, as some defendants were. See, *e.g.*, *Commonwealth* v. *Harrelson*, 14 S. W. 3d 541, 544 (Ky. 2000); see also *New Hampshire Hemp Council, Inc.* v. *Marshall*, 203 F. 3d 1, 5 (CA1 2000) (noting that "the threat of federal prosecution [was] realistic" when hemp was still

on the federal schedules).   The distinction between a conviction for a drug crime involving marijuana versus one involving hemp could be a significant one for purposes of a future firearms prosecution that might trigger ACCA.   But a defendant in Brown's position would likely have "no incentive to contest" that his conduct involved hemp, not another form of marijuana, during the state prosecution because that fact did "not matter under the law" at that time.   *Mathis*, 579 U. S., at 512.   Indeed, he might well have been "precluded from doing so by the [state] court."   *Ibid.*   It is highly unlikely that such a defendant could even contemplate that his state conviction would be relevant to a future ACCA conviction, because most state crimes have "no significance under federal law for years to come."   *Johnson* v. *United States*, 544 U. S. 295, 305 (2005).

Unfairness arises without the categorical approach, because such a defendant's punishment would be significantly increased under ACCA for a prior state crime involving hemp simply due to his failure to anticipate, at the time of his state convictions, a future change in the federal drug schedules.   The categorical approach responds to that unfairness by relying exclusively on the elements of the state crime, rather than the underlying facts of the crime.

So, as long as the drug substances expressly prohibited by state law differ from those that the federal law proscribes, then that state law is not a categorical match to ACCA's "serious drug offense" definition, and a conviction under that statute cannot be used as an ACCA predicate.   Here, however, the majority suggests that the categorical mismatch is irrelevant because, regardless, petitioners' state crimes actually involved types of drugs that have remained on the federal schedules during all potentially pertinent time periods.   *Ante*, at 114.   That reasoning not only fails to follow our well-established methodology, it also perpetuates the same unfairness that the categorical approach is designed to mitigate.

B

The majority fares no better with statutory context. The majority's opinion points to ACCA's other definition of "serious drug offense," 18 U. S. C. § 924(e)(2)(A)(i), which classifies certain *federal* crimes as "serious drug offenses." That provision defines a "serious drug offense" as "an offense under the Controlled Substances Act (21 U. S. C. [§ ]801 et seq.), the Controlled Substances Import and Export Act (21 U. S. C. [§ ]951 et seq.), or chapter 705 of title 46 for which a maximum term of imprisonment of ten years or more is prescribed by law." § 924(e)(2)(A)(i). As the majority notes, this definition turns solely on "whether a defendant was convicted and sentenced for such an offense, and a later change in a federal drug schedule cannot change that fact." *Ante*, at 112 (footnote omitted). In the majority's view, we should avoid "treat[ing] . . . federal and state offenses differently," so the applicability of ACCA's penalty to prior state crimes, too, must be based simply on whether the federal drug schedules matched state law at the time of the defendant's prior state conviction. *Ibid.*

Whatever the merits of treating federal and state offenses the same way might be, Congress did not draft ACCA to achieve that result. When this Court previously addressed these same two ACCA provisions in response to a similar argument, it recognized that "the divergent text of the two provisions of the serious-drug-offense definition . . . makes any divergence in their application unremarkable." *Shular*, 589 U. S., at 164 (internal quotation marks omitted). Congress certainly could have used the same classification metric for federal and state priors—say, by classifying federal crimes as "serious drug offenses" based on the particular controlled substances involved, as it did with state crimes— but did not do so. And we generally "'presume differences in language . . . convey differences in meaning,'" especially "when the same Congress passed both statutes to handle much the same task." *Wisconsin Central Ltd.* v. *United*

JACKSON, J., dissenting

*States*, 585 U. S. 274, 279 (2018) (quoting *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, 86 (2017)). Congress's choice to phrase the two "serious drug offense" definitions in ACCA differently "requires respect, not disregard." *Wisconsin Central*, 585 U. S., at 279.

At any rate, unlike the first subsection of ACCA's "serious drug offense" definition, the second subsection involves classifying state crimes *based on federal law*—a circumstance that, as I previously explained, requires the categorical approach. See *supra*, at 134–135. This means that some federal-state discrepancy as to the kinds of crimes that are deemed "serious drug offenses" is not at all surprising or unusual; it is par for the course. See *Shular*, 589 U. S., at 164.

To see why, consider one example. The Controlled Substances Act provides that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U. S. C. §841(a)(1). We have previously recognized that "the statute's word 'knowingly' . . . appl[ies] to all the subsequently listed elements of the crime" in this provision, meaning that the Government must prove that a defendant knew he was dealing with a controlled substance. *Flores-Figueroa* v. *United States*, 556 U. S. 646, 650 (2009). State law, by contrast, does not always include such a knowledge requirement. See *United States* v. *Smith*, 983 F. 3d 1213, 1223 (CA11 2020). We have nonetheless recognized that ACCA applies differently to state and federal drug crimes on this basis. See *Shular*, 589 U. S., at 164.

Thus, the ultimate question is not whether ACCA requires consistency between the classification of federal and state crimes, as the majority suggests. Instead, given some inevitable inconsistency between state and federal law, our inquiry is "which form of consistency Congress intended." *Id.*, at 165. Here, Congress's use of an express cross-

reference to the Controlled Substance Act's mutating drug schedules in the state-crime definition—coupled with its omission of such a cross-reference in the federal-crime definition—indicates that inconsistency based on drug type was not only anticipated but intended.

In short, the presence of a differently worded § 924(e)(2)(A)(i) does not overcome the plain meaning of § 924(e)(2)(A)(ii).

## IV

Finally, the majority contends that its reading "best fulfills ACCA's statutory objectives." *Ante*, at 113. But that assertion fails to appreciate ACCA's actual goals. Congress has plainly designated serious drug offenses in a defendant's criminal history as triggers for ACCA's 15-year mandatory minimum for a reason—because the seriousness of the defendant's prior drug-related history is indicative of that defendant's future dangerousness, given the present firearms offense. The majority's analysis falters because it does not, and frankly cannot, explain how future dangerousness is best assessed by reference to outdated drug schedules.

Congress indisputably enacted ACCA to incapacitate what it viewed to be a class of especially dangerous defendants— "the eponymous 'armed career criminal.'" *Wooden* v. *United States*, 595 U. S. 360, 375 (2022). The 15-year mandatory minimum that ACCA imposes is among the harshest mandatory penalties in the Federal Criminal Code, and "the length of the mandatory minimum was set at 15 years" specifically "to incapacitate the armed career criminal for the rest of the normal time span of his career[,] which usually starts at about age 15 and continues to about age 30." S. Rep. No. 97–585, p. 7 (1982). This means that ACCA is not a simple recidivist statute that merely tallies up past offenses, as the majority suggests, see *ante*, at 114–115, thereby imposing a drastically increased penalty for illegal firearms possession based on a "once a criminal, always a criminal" perspective. Rather, Congress designed ACCA to

JACKSON, J., dissenting

help courts identify a certain category of defendants—those who, having a particular kind of criminal history and now unlawfully possessing a gun, pose such a distinct risk of future dangerousness that a lengthy term of incapacitation is warranted.[4]

"In order to determine which offenders fall into this category," ACCA directs a sentencing court to conduct a review of a defendant's "past crimes" under state law, looking for violent felonies or serious drug offenses, "because . . . criminal history is relevant . . . to the kind or degree of danger the offender would pose were he to possess a gun." *Begay* v. *United States*, 553 U. S. 137, 146 (2008). But, importantly, ACCA does not deem *every* state crime a predicate for the 15-year mandatory minimum. Instead, the statute specifies certain categories of crimes that trigger application of the prescribed penalty, due to the "prior crime's relevance to the possibility of future danger with a gun." *Ibid.*

ACCA's focus on incapacitating certain defendants based on their potential future dangerousness makes it entirely sensible that the statute directs courts to identify "serious drug offense[s]" (as well as "violent felon[ies]") in a defendant's background. 18 U. S. C. § 924(e)(1). What does not make sense is the majority's suggestion that ACCA requires the extended incapacitation of defendants based on past criminal conduct that federal law does not deem serious today. In other words, if the point of ACCA is the incapacitation of certain defendants—those whose histories of serious criminality indicate a propensity to commit future dangerous crimes in light of their unlawful possession of a weapon—how does a record that contains past crimes involving drugs that are no longer controlled substances help to identify especially dangerous defendants? It does not.

───────────

[4] "Of course, to say that Congress had reasons" to enact ACCA's sentencing scheme "is not to endorse those policy choices." *Consumer Financial Protection Bureau* v. *Community Financial Services Assn. of America, Ltd.*, 601 U. S. 416, 447 (2024) (JACKSON, J., concurring).

In reality, *that* goal is achieved only by determining whether a defendant's past crimes are considered serious by today's standards. The federal drug schedules are specifically updated to account for current views of dangerousness. See Part I–A, *supra.* And a drug's removal from those schedules reflects a determination that the drug is no longer deemed dangerous based on criteria such as "[i]ts actual or relative potential for abuse" and "[t]he state of current scientific knowledge regarding the drug." 21 U. S. C. §811(c). Accordingly, ACCA is best interpreted as referencing the drug schedules that are effective as of the date of the commission of the gun crime that triggers ACCA's applicability, rather than those that would have signaled seriousness at some prior time. "Indeed, it would be illogical to conclude that federal sentencing law attaches 'culpability and dangerousness' to an act that . . . Congress has concluded is *not* culpable and dangerous." *United States* v. *Bautista*, 989 F. 3d 698, 703 (CA9 2021) (Fletcher, J.).

Meanwhile, the majority's view misses the mark that Congress set for ACCA's sentencing scheme in another respect as well: It leaves out many defendants who *do* warrant incapacitation for dangerousness—those who have prior convictions for trafficking drugs that were scheduled as controlled substances by the time their §922(g) offenses were committed but were not on the federal drug schedules when their prior state convictions occurred. The majority concedes that its interpretation would exclude from ACCA's "serious drug offense" definition state drug crimes that occur when "States . . . criminalize drugs before the Federal Government does so." *Ante*, at 122. This happens not infrequently, such as when a State criminalizes new, cutting-edge drugs. See, *e. g., ibid.* (discussing the criminalization of bath salts and methoxetamine by States before the Federal Government); see also Brief for Petitioner Jackson 34–35 (citing other examples); Brief for Petitioner Brown 17 (same).

Under the majority's approach, ACCA's intended assessment of future dangerousness via the consideration of past state drug crimes would not apply to defendants if their prior state convictions took place before the drugs they trafficked were federally scheduled. But under the statutory scheme Congress actually adopted, there is no reason a defendant's early engagement with dangerous new drug substances criminalized by state law should not qualify as ACCA predicates, especially since the federal drug schedules are frequently updated to account for precisely this sort of newfound danger, consistent with ACCA's broader approach.

Ultimately, then, for all its talk of statutory goals, the majority's opinion elides the true purpose of ACCA's mandatory minimum scheme in multiple ways. It also downplays the means Congress adopted to advance its incapacitation objectives, by essentially ignoring the link the statute draws between potential future dangerousness, as partially evidenced by the seriousness of a defendant's past drug activity, and the need for lengthy incapacitation, which the statute provides. Breezing past these key nuances, the majority simply announces its own apparent view that "[a] prior drug conviction for an offense punishable by 10 years' imprisonment augurs a risk of future dangerousness even if the drug is no longer considered dangerous." *Ante*, at 114.[5]

---

[5] The majority's opinion offers no concrete evidence for this empirical assertion. And its strained analogy to bootleggers at the end of Prohibition, who supposedly "shifted to other illegal enterprises," *ante*, at 114, paints a woefully incomplete historical picture. Contrary to the majority's contentions, the end of Prohibition allowed many of those previously involved in the illegal alcohol trade to transition into successful, legitimate careers. See, *e. g.*, D. Okrent, Last Call: The Rise and Fall of Prohibition 359–360 (2010) (discussing Samuel Bronfman, a former bootlegger who turned his company Seagram's into one of the largest liquor-distribution corporations in the world). Regardless, there is simply no evidence in ACCA's legislative history or otherwise that Congress drew the same historical lessons from Prohibition that the majority does, or that ACCA was motivated in any respect by our Nation's experiences during Prohibition.

\*      \*      \*

At bottom, the majority's reasoning appears to reduce to a disagreement with Congress's legislative judgment, embodied in the text of the Controlled Substances Act, that a change in the drug schedules is a change in the perceived dangerousness of a drug that should have a material impact on the determination whether incapacitation is warranted. See 21 U. S. C. §811(a).   The Court's ruling thus displaces Congress's decision to base ACCA's 15-year mandatory penalty on the evolving dangerousness determinations that the Controlled Substances Act incorporates rather than on static impressions about a defendant's recidivist tendencies based solely on the fact that they have previously committed crimes.

The majority's contrary holding seems to reflect its own policy view that "Brown's and Jackson's multiple convictions" pose a significant risk of future dangerousness "despite the technical changes to the federal drug schedules." *Ante,* at 115.   But the choice of how to assess and address dangerousness belongs first and foremost to Congress.   And for the reasons I have explained, Congress designed ACCA to take a different approach—to measure future dangerousness by today's drug schedules, not outdated ones from the past.   See Part I, *supra.*   One might harbor doubts that the sentencing policy that Congress enacted is sensible, just, or effective.   But it is the one that Congress wrote, and we remain dutybound to apply the law as written.   In my view, the majority has failed to do so here.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 102, line 13: "conviction" is replaced with "offense"

p. 109, n. 2, line 5: "Verdict" is replaced with "Judgment"

p. 109, n. 2, line 6: "May 1, 2014" is replaced with "Oct. 8, 2015, recorded Oct. 19, 2015"

p. 112, line 4 from bottom: "subsections" is replaced with "clauses"

p. 112, line 3 from bottom: "(A)" is inserted after "(2)"

p. 118, line 16: "current" is inserted before "federal"; "that are currently in effect" is deleted

p. 118, line 17: "for sentencing purposes" is deleted; "that were" is replaced with "in"; "effective" is replaced with "effect"

p. 123, line 11: "conviction" is replaced with "offense"

p. 134, line 9 from bottom: "reflected" is replaced with "reflect"