[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10007

_____

SUNSHINE STATE REGIONAL CENTER, INC.,

Plaintiff-Appellant,

*versus*

DIRECTOR, US CITIZENSHIP AND IMMIGRATION SER-VICES,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:23-cv-60795-JEM

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

ROSENBAUM, Circuit Judge:

The EB-5 "immigrant investor" program makes a limited number of visas available to people seeking to immigrate to the United States if they invest in a job-creating enterprise within the country. Most of these visa-seekers invest through "regional centers," which pool investors' capital and channel it for maximum job impact.

The large dollars have tended to breed fraud and abuse in earlier iterations of the regional-center program. Because of these concerns and others, Congress passed the EB-5 Reform and Integrity Act of 2022 ("Act"). The Act established an "EB-5 Integrity Fund" to pay for efforts to ensure compliance with the rules of the EB-5 program. That fund, in turn, gets money from various sources, including an annual fee that regional centers must pay.

Plaintiff-Appellant Sunshine State Regional Center, Inc., ("Sunshine State") is an EB-5 regional center that predates the Act by years. Although Sunshine State has ongoing investments and associated immigrant investors, it is not currently sponsoring new investment projects or visa-seekers. So Sunshine State argues that the Act does not subject it to the annual fee for the EB-5 Integrity Fund (the "Integrity Fund Fee"), and, in the alternative, that doing so would be "unlawfully retroactive."

The district court disagreed.  So it denied Sunshine State's motion for summary judgment and granted, in part, the motion to dismiss Sunshine State's complaint that the United States Citizenship and Immigration Services ("USCIS"), the agency that administers the regional-center program, filed.

We think the district court got it right.  As we explain, the Act's text reveals no intent to exempt pre-Act regional centers from the Integrity Fund Fee.  And the Act's structure suggests the opposite.  Sunshine State's arguments also likely prove too much: If we accepted its claims, their logical implication would be that Sunshine State must redo the process of becoming a designated regional center before it can participate in the EB-5 program.

## I.    BACKGROUND

Before we discuss the facts here, we pause to consider the governing regulatory framework.  We divide our discussion into five parts.  First, we explain the EB-5 program.  Second, we review the changes to that program that the Act imposed.  Third, we consider a relevant settlement in a case involving a challenge to USCIS's initial interpretation of the Act.  Fourth, we recite USCIS's plans to collect the Integrity Fund Fee from all regional centers, which bring us here today.  And finally, we describe Plaintiff-Appellant Sunshine State and its arguments before the district court and on appeal.

### A. The EB-5 Program

The "immigrant investor" visa program originated in 1990 as the employment-based, fifth preference (thus "EB-5"), visa program. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 121(a), 104 Stat. 4978, 4987–90. At its inception, the EB-5 program made visas available to qualified immigrants who sought to invest directly in a new commercial enterprise that creates at least ten full-time jobs in the United States. *Id.*

Two years after creating the program, Congress launched a "pilot program" setting aside some EB-5 visas each year for qualified immigrants who invested through "a regional center." Pub. L. No. 102-395, § 610, 106 Stat. 1828, 1874 (1992) (codified as amended at 8 U.S.C. § 1153 note, repealed 2022). As we've noted, regional centers pool investing immigrants' contributions to obtain the biggest investment bang for the buck. The pilot program added certain immigration advantages for investors in regional centers in that they could count indirectly created jobs towards the EB-5 program's job-creation quota. *Id.* § 610(c).

Congress in 2002 amended the statute that governs the program to provide that regional centers were to be "designated by the Attorney General on the basis of a general proposal." Pub. L. No. 107-273, § 11037(a)(1), 116 Stat. 1758, 1847 (2002). Congress later vested the authority to designate regional centers in the Secretary of Homeland Security instead. Pub. L. No. 108-156, § 4(a)(1), 117 Stat. 1944, 1945 (2003).

At first, Congress slated the visa set-aside for regional centers to last only five years.  Pub. L. No. 102-395, § 610(b), 106 Stat. at 1874.  But Congress repeatedly extended the sunset date.[1]  And in 2012, Congress removed the regional-center program's "pilot" status.  Pub. L. No. 112-176, § 1, 126 Stat. at 1325.

But all was not well with the regional-center program.  In the 2010s, it came under fire for allegations of "fraud and abuse." *See EB5 Holdings, Inc. v. Jaddou*, 717 F. Supp. 3d 86, 92 (D.D.C. 2024); *Da Costa v. Immigr. Inv. Program Off.*, 643 F. Supp. 3d 1, 5 (D.D.C. 2022), *aff'd*, 80 F.4th 330 (D.C. Cir. 2023).

So in 2020, Congress passed one final amendment to the original 1992 statute, extending the visa set-aside through June 2021.  Pub. L. No. 116-260, div. O, tit. I, § 104, 134 Stat. 1182, 2148 (2020).  The visa set-aside lapsed in June 2021.  *Da Costa*, 643 F. Supp. 3d at 7.

---

[1] *See* Pub. L. No. 105-119, § 116(a)(2), 111 Stat. 2440, 2467 (1997); Pub. L. No. 106-396, § 402(a), 114 Stat. 1637, 1647 (2000); Pub. L. No. 108-156, § 4(b), 117 Stat. 1944, 1945 (2003); Pub. L. No. 110-329, § 144, 122 Stat. 3574, 3581 (2008); Pub. L. No. 111-8, div. J, § 101, 123 Stat. 524, 988 (2009); Pub. L. No. 111-83, § 548, 123 Stat. 2142, 2177 (2009); Pub. L. No. 112-176, § 1, 126 Stat. 1325, 1325 (2012); Pub. L. No. 114-113, div. F, tit. V, § 575, 129 Stat. 2242, 2526 (2015); Pub. L. No. 115-31, div. F, tit. V, § 542, 131 Stat. 135, 432 (2017); Pub. L. No. 115-141, div. M, tit. II, § 204, 132 Stat. 348, 1049 (2018); Pub. L. No. 116-6, div. H, tit. I, § 104, 133 Stat. 13, 475 (2019); Pub. L. No. 116-94, div. I, tit. I, § 104, 133 Stat. 2534, 3019 (2019).

### B.  The EB-5 Reform and Integrity Act

Nine months later, Congress passed the EB-5 Reform and Integrity Act of 2022.  Pub. L. No. 117-103, div. BB, 136 Stat. 49, 1070–109 (2022).  In a section entitled "Reauthorization and Reform of the Regional Center Program," the Act "repealed" the scant statutory language that had once authorized the regional-center program.  *Id.* § 103(a).  In its place, the Act enacted a new framework for the regional-center program, authorized the program through September 2027, and codified several protections against fraud and abuse.  *Id.* § 103(b)(1) (codified at 8 U.S.C. § 1153(b)(5)).

Section 203(b)(5)(E) of the Immigration and Nationality Act, codified at 8 U.S.C. § 1153(b)(5)(E), now houses the regional-center program's authorization.  Pub. L. No. 117-103, div. BB, § 103(b)(1), 136 Stat. at 1075.  One critical section in subparagraph (E) provides that "[v]isas under this subparagraph shall be made available . . . to qualified immigrants . . . participating in a program implementing this paragraph that involves a regional center in the United States, which has been designated by the Secretary of Homeland Security on the basis of a proposal for the promotion of economic growth."  8 U.S.C. § 1153(b)(5)(E)(i).  The EB-5 Reform and Integrity Act of 2022 added other language specifying the required contents of a "proposal to establish" a regional center and imposing annual reporting obligations.  *Id.* § 1153(b)(5)(E)(iii), (G).

Most important here, the Act requires the Secretary of Homeland Security to collect from "each regional center designated under subparagraph (E)" the Integrity Fund Fee: an annual

fee that regional centers must pay into a new "EB-5 Integrity Fund" used to investigate EB-5 fraud. *Id*. § 1153(b)(5)(J)(ii)(I), (iii). Smaller regional centers—those with "20 or fewer total investors in the preceding fiscal year in its new commercial enterprises"—must pay $10,000 annually. *Id*. § 1153(b)(5)(J)(ii)(I)(bb). Larger regional centers must pay double that amount. *Id*. § 1153(b)(5)(J)(ii)(I)(aa).

### C.  *The* Behring *Settlement*

A key backdrop to this case is a 2022 judicial decision and settlement about the treatment of pre-Act regional centers. *See Behring Reg'l Ctr. LLC v. Mayorkas*, No. 22-CV-02487, 2022 WL 2290594 (N.D. Cal. June 24, 2022).

After Congress enacted the Act, USCIS, the agency that administers the regional-center program, announced that the program had been fully "repealed." *Id*. at *2. So USCIS determined that pre-Act regional centers—those designated under the original regional-center statute—were "no longer authorized" and had to reapply for authorization. *See id*. USCIS asserted that the text of the Act compelled this conclusion. *See id*. at *6.

In *Behring*, a district court preliminarily enjoined USCIS's decision. *Id*. at *7. The court reasoned that the Act's text did not clearly "automatically deauthorize existing regional centers" and that some provisions revealed Congress's intent not to do so. *Id*. at *3–5. Because the *Behring* court viewed USCIS's decision as based on only an erroneous view of the law, the court held it was "exceedingly likely (if not certain)" to be arbitrary and capricious. *Id*. at *6. Then the court enjoined the agency from treating pre-Act

centers as "deauthorized." *Id.* at \*7. Still, the court permitted USCIS to "do whatever is reasonably necessary to ensure that the existing regional centers comply with the Integrity Act." *Id.*

Consistent with the *Behring* decision, several pre-Act regional centers entered into a settlement with USCIS. The agency agreed to rescind its categorical deauthorization of pre-Act regional centers. But pre-Act regional centers that wished to continue sponsoring new investment projects and new investors had to submit a new application for a regional-center designation, using Form I-956. And the settlement provided that pre-Act regional centers "sponsoring new projects or new investors under the Integrity Act will comply with all the requirements of the Integrity Act."

Under the settlement, a pre-Act regional center that failed to file a Form I-956 application would not be permitted to "engage in any activities under the Integrity Act." But pre-Act visa-seekers would not be penalized for their regional center's failure to submit new paperwork: USCIS committed to "continue to process and adjudicate . . . petitions from investors filed prior to the Integrity Act . . . even if the regional center with which their project was approved does not file a Form I-956 application."

### D.  USCIS's Collection of the Integrity Fund Fee

All of this brings us to the central issue in this case. In March 2023, USCIS and the Department of Homeland Security, of which USCIS is a part, announced their plans to implement the annual Integrity Fund Fee. *See* Notice of EB-5 Regional Center Integrity Fund Fee, 88 Fed. Reg. 13,141 (Mar. 2, 2023). The agency said that

the Act required "the collection of an annual fee paid by and collected from designated regional centers." *Id.* at 13,142. USCIS did not distinguish between pre-Act and post-Act regional centers, apparently thinking it self-evident that the fee applied to every regional center. *See id.* Rather, the substance of the notice discussed how regional centers should calculate their "number of investors" to determine their fee amount, *id.* at 13,142–43, and the payment process, *id.* at 13,143. USCIS also announced that it would exercise its "discretionary enforcement authority" not to charge the statutorily required "reasonable penalty fee" for late payment of the Integrity Fund Fee for fiscal year 2023. *See id.* But the agency would, under the Act, "terminate the designation" of regional centers that did not pay the fee within 90 days of its coming due. *Id.* (citing 8 U.S.C. § 1153(b)(5)(J)(iv)).

### E.  *Sunshine State*

Plaintiff-Appellant Sunshine State is a regional center associated with investments in several new commercial enterprises in Florida. USCIS designated Sunshine State as a regional center in 2014, well before Congress passed the Act.

Sunshine State currently has 23 investors with petitions pending before USCIS. But it says that it has pursued no investors or investment projects since the Act's passage. Based on this fact, Sunshine State figures that it has "no incoming revenue" and so cannot afford to pay the Integrity Fund Fee "in perpetuity."

After USCIS announced its plan to collect the Integrity Fund Fee from all regional centers, no matter whether they were

designated before the Act or whether they are now taking investors, Sunshine State sued the USCIS Director in the Southern District of Florida.  In its suit, Sunshine State challenged the agency's imposition of the Integrity Fund Fee on pre-Act regional centers. Sunshine State sued under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, claiming that USCIS's decision was contrary to the Act and so was arbitrary and capricious or ultra vires.

Sunshine State's argument in the district court and on appeal is simple: The Act imposes the Integrity Fund Fee on regional centers "designated under subparagraph (E)."    8 U.S.C. § 1153(b)(5)(J)(ii)(I).  Subparagraph (E) provides for visas to be made available to investors in regional centers "designated by the Secretary of Homeland Security."  *Id.* § 1153(b)(5)(E)(i).  But subparagraph (E) did not exist before Congress passed the Act—when Sunshine State received its regional-center designation in 2014.  So, the argument goes, Sunshine State cannot rightly be said to have been "designated under subparagraph (E)."  And so, Sunshine State continues, the Act does not require Sunshine State to pay the annual Integrity Fund Fee.

## II.    PROCEDURAL HISTORY AND JURISDICTION

After suing, Sunshine State sought a preliminary injunction to prevent USCIS from requiring it to pay the Integrity Fund Fee. Soon after, Sunshine State moved for summary judgment as well. For its part, USCIS moved to dismiss the case on jurisdictional grounds and, in the alternative, because USCIS correctly

interpreted the Act to require both old and new regional centers to pay the Integrity Fund Fee.

The district court determined that it enjoyed jurisdiction but agreed with USCIS's reading of the Act. So it denied Sunshine State's motion for summary judgment and granted in part USCIS's motion to dismiss, solely as to the proper interpretation of the Act's Integrity Fund Fee provision.

Sunshine State appealed the district court's judgment. We exercise jurisdiction over the final decision of the district court under 28 U.S.C. § 1291.

### III.    STANDARD OF REVIEW

We review a district court's summary judgment order de novo. *Ward v. U.S. Att'y Gen.*, 608 F.3d 1198, 1200 (11th Cir. 2010) (per curiam). "Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* (quotation marks omitted).

We review a district court's grant of a motion to dismiss de novo, "accept[ing] the allegations in the complaint as true, and constru[ing] them in the light most favorable to the plaintiff." *Perez v. U.S. Bureau of Citizenship & Immigr. Servs.*, 774 F.3d 960, 964 (11th Cir. 2014) (per curiam).

We also review questions of law, such as the construction of a statute, de novo. *Brasil v. Sec'y, Dep't of Homeland Sec.*, 28 F.4th 1189, 1192 (11th Cir. 2022) (per curiam).

When we review agency action, we "must exercise [our] independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). To be sure, "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Id.* at 412–13. But we "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 413.[2]

## IV.    DISCUSSION

Our task here is straightforward. The Act directs the Secretary to levy an annual Integrity Fund Fee on "each regional center designated under subparagraph (E)." 8 U.S.C. § 1153(b)(5)(J)(ii)(I). We must determine whether this phrase applies to regional centers whose designations began before Congress passed the Act.

Our answer to this question of statutory interpretation begins with the statutory text. *United States v. Garcon*, 54 F.4th 1274, 1277 (11th Cir. 2022) (en banc), *abrogated on other grounds by Pulsifer*

---

[2] The parties finished briefing this appeal before the Supreme Court announced its decision in *Loper Bright*. *Loper Bright* displaced the more deferential standard for reviewing agencies' statutory interpretations that *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), laid out. We follow *Loper Bright* here, but the differences between *Loper Bright* and *Chevron* do not materially affect our decision.

*v. United States*, 601 U.S. 124 (2024).  We consider the text's terms, the structure of the Act, and the context in which section 1153(b)(5)(J)(ii)(I) arises.  When we do, the best reading of that text requires the conclusion that the Integrity Fund Fee applies to all designated regional centers, no matter when their designation began.

### A.  Both pre- and post-Act regional centers are "designated under subparagraph (E)."

We start with the statutory text.  But our analysis ends there only if the text provides an unambiguous answer to our question.  *See United States v. F.E.B. Corp.*, 52 F.4th 916, 926 (11th Cir. 2022).  This text does not.

The relevant part of the statute directs the Secretary to "collect for the Fund an annual fee . . . from each regional center designated under subparagraph (E)."  8 U.S.C. § 1153(b)(5)(J)(ii)(I).  That leaves us with questions: Does "designated" refer to a discrete event in the past or to an ongoing status as a designated regional center?  And what does it mean for a designation to be "under subparagraph (E)"?

We begin with the word "designated."  As our sister circuit has observed, a past participle like "designated" is, linguistically, an "uncommonly flexible device."  *Bernal v. NRA Grp., LLC*, 930 F.3d 891, 895 (7th Cir. 2019).  Past participles can suggest a "past or completed action or time."  *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (quoting *American Heritage Dictionary* 1287 (4th ed. 2000)).  But they also "are routinely used as adjectives

14                    Opinion of the Court                24-10007

to describe the present state of a thing." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 84 (2017). Put simply, the temporal content of this critical word is unclear. *Cf. Bello v. Gacki*, 94 F.4th 1067, 1072 (D.C. Cir. 2024) (remarking that "'designated by' is a temporally ambiguous adjectival phrase").

And the phrase "under subparagraph (E)" does not clarify things. "The word 'under' has many dictionary definitions and must draw its meaning from its context." *Ardestani v. INS*, 502 U.S. 129, 135 (1991). So we must look beyond that individual phrase.

We do that in the next sections. And when we consider the Act as a whole, several reasons warrant the conclusion that pre- and post-Act regional centers alike are "designated under subparagraph (E)." We'll call this the "broad interpretation" of 8 U.S.C. § 1153(b)(5)(J)(ii)(I), in contrast with Sunshine State's narrower alternative.

1.  <u>The broad interpretation is consistent with the overall statutory framework of the EB-5 program.</u>

First, the broad interpretation fits right in with the overall framework that the Act creates.

The Act's reference to its own "subparagraph (E)" lies at the heart of this case.[3] Subparagraph (E), in turn, is entitled "Regional

---

[3] For the sake of convenience, we refer colloquially to this provision as subparagraph (E) of the Act. More precisely, though, it is subparagraph 203(b)(5)(E) of the Immigration and Nationality Act, which the EB-5 Reform and Integrity Act of 2022, or "Act," added. Pub. L. No. 117-103, div. BB,

center program." 8 U.S.C. § 1153(b)(5)(E). The critical part of that subparagraph is its first clause, titled "In general." This clause explains how a prospective immigrant can obtain a visa by investing in a regional center:

> Visas under this subparagraph shall be made available through September 30, 2027, to qualified immigrants (and the eligible spouses and children of such immigrants) pooling their investments with 1 or more qualified immigrants participating in a program implementing this paragraph that involves a regional center in the United States, which has been designated by the Secretary of Homeland Security on the basis of a proposal for the promotion of economic growth, including prospective job creation and increased domestic capital investment.

*Id.* § 1153(b)(5)(E)(i).

It's a clunky sentence. But as with people, statutes' awkward moments are often the most revealing. Subparagraph (E) is drafted inelegantly because it's doing three distinct things. It (1) defines "a *program* implementing this paragraph that involves a regional center," (2) provides that regional centers are to be "*designated* by the Secretary of Homeland Security on the basis of a proposal for the promotion of economic growth," and (3) makes

---

§ 103(b)(1), 136 Stat. at 1075–78. We treat other subparagraphs that the Act added the same way.

available *visas* for "qualified immigrants . . . participating" in the regional-center program.  *Id.* (emphases added).

Subparagraph (E) makes clear that the Act centers on and governs the EB-5 regional-center *program*.  Regional centers are "designated" as part of that program.  And immigrants "participating" in the program are eligible to obtain visas.

This framework—and much of subparagraph (E)'s text—derives from the statutes that preceded the Act.  Those laws reveal that the "program," rather than a "designation," is subparagraph (E)'s key unit.

Indeed, the original regional-center statute didn't involve the notion of "designation" at all.  *See* Pub. L. No. 102-395, § 610, 106 Stat. at 1874.  Rather, the 1992 law that created the regional-center "pilot program" provided simply that "the Secretary of State, together with the Attorney General, shall set aside visas for a pilot program . . . [and s]uch pilot program shall involve a regional center in the United States for the promotion of economic growth."  *Id.* § 610(a).  It wasn't until a decade later that Congress amended the law to specify that regional centers be "designated."  *See* Pub. L. No. 107-273, § 11037(a), 116 Stat. at 1847.

So subparagraph (E) governs the regional-center "program implementing this paragraph" and links the secondary concept of "designat[ion]" to that program.

Sunshine State urges us to understand "designation" narrowly.  In Sunshine State's view, designation occurs at one moment in time and operates independently of the EB-5 program for

which a regional center is designated.  But the statutory text and common sense require the opposite conclusion.

Yes, Sunshine State first became "designated" under a different statute, one that predated the Act's addition of subparagraph (E).  But Sunshine State was designated as part of the same regional-center *program* that now finds a home in subparagraph (E).  To be "designated under subparagraph (E)" is to be designated to participate in the regional-center *program* under subparagraph (E).  The only regional-center program is the one under subparagraph (E).  So any designation for that program must now operate under subparagraph (E), too.

Sunshine State fights this common-sense answer, relying mainly on the *Behring* decision.  But assuming without deciding that *Behring* was right, that ruling supports the interpretation we conclude governs.

As we've noted, the *Behring* court addressed USCIS's determination that the Act required it to "deauthorize any regional centers that [USCIS] had designated" under previous statutes.  *Behring*, 2022 WL 2290594, at *4.  The court held that the plaintiff there was "exceedingly likely" to establish in a merits proceeding that USCIS's decision was arbitrary and capricious.  *Id.* at *6.  In the *Behring* court's view, the agency scarcely justified its interpretation of the Act, and the text of the statute suggested Congress did not intend to remove the designation of previously authorized regional centers.  *Id.* at *4, *6.

The court then rejected USCIS's argument that the Act de-designated all regional centers because it "repealed" the prior regional-center statute. *Id.* at \*4. To the contrary, the court posited, rather than intending to deauthorize all regional centers, "perhaps Congress was simply removing language from one place in the tapestry of statutory law . . . and inserting the new language into a more stable part." *Id.*

The same logic would apply here. *Behring* preserved pre-Act regional centers' designations based on the Act's retention of the regional-center program even while the Act imposed new rules. On this reading, the Act did not eliminate the program and then create a new (but strikingly similar) program from scratch. Rather, the Act's alleged "repeal" of the old regional-center statute was really a relocation. And if the Act's wholesale elimination of the old law in fact just relocated the statutory authority for the regional-center *program*, the authority to *designate* regional centers must have been in the statutory U-Haul truck as well.

Assuming Sunshine State believes *Behring*'s interpretation of the Act was correct,[4] the game is up. To rule for Sunshine State, we'd need to conclude that the Act sufficiently rooted pre-Act regional centers in the new statute for them to maintain their

---

[4] And Sunshine State must believe as much. If *Behring*'s view were wrong, then pre-Act regional centers would be fully de-designated. In that case, Sunshine State would be in a situation no better than the one it faces here. To participate in the regional-center program, Sunshine State would have to become "designated" under the Act's process in subparagraph (E)—subjecting it to the very fees it now claims do not apply.

designations but that the old statute somehow remained the source of those designations. But for the reasons we've explained, we just don't see how that's possible.

2. Congress's usage of "designate," "designation," and "establishment" supports the broad interpretation.

Two aspects of how Congress used—and didn't use—forms of "designate" also support the broad interpretation.

First, Congress's other uses of "designation" in the statute show that a regional center's designation is an ongoing status—not something that happens once and is over. The statute's paragraph about the EB-5 program contains several references to the Secretary's ability to "suspend" or "terminate" a regional center's designation in some cases. 8 U.S.C. § 1153(b)(5)(E)(vii)(III), (F)(v)(II), (G)(iii)(II)(dd), (H)(iv)(I), (I)(iv), (J)(iv)(II). That would be illogical if Congress intended the word "designation" and its variants to refer to a discrete past act. After all, it would be hard to "suspend" or "terminate" something that occurred only in the past and lacks continuing status. But the usage makes perfect sense if we read the regional center's "designation" as an ongoing status that the Secretary may pause or end. That suggests we should interpret "designated" in subclause (J)(ii)(I) the same way. We presume that "word[s] or phrase[s] . . . bear the same meaning throughout a text" when a statute uses "materially the same language." *Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1158–59 (11th Cir. 2021) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)).

Congress's use of "designated" in subparagraph (E)'s critical "In general" clause leads to the same conclusion.  Again, that clause directs the Secretary to make visas available through "a program implementing [8 U.S.C. § 1153(b)(5)] that involves a regional center in the United States, which has been designated by the Secretary of Homeland Security" based on a proposal for economic growth, job creation, and capital investment.  8 U.S.C. § 1153(b)(5)(E)(i).  Congress used the present-perfect tense here: "has been designated."  As we noted is true of past participles, the present-perfect tense can support multiple temporal meanings.  It "can refer to either (1) 'an act, state, or condition that is now completed' or (2) 'a past action that comes up to and touches the present.'"  *Hewitt v. United States*, No. 23-1002, ___ S. Ct. ___, slip op. at 6 (U.S. June 26, 2025) (emphases omitted) (quoting *The Chicago Manual of Style* § 5.132 (17th ed. 2017)).

But only the second option makes sense here.  It nearly goes without saying: When the Secretary terminates a regional center's designation as part of the EB-5 program, it may no longer participate in the program.  Interpreting "has been designated" to refer to a "state . . . that is now completed" would produce an unnatural result.  It would mean the Secretary must make visas available for investors in a regional center that *was* designated at some point in the past but later had its designation terminated due to misconduct.

Moreover, "[w]hat makes this the *present*-perfect tense is that, in each of its manifestations, there exists a connection to the present."  *Id.* at 7 n.5 (citing Rodney Huddleston & Geoffrey K.

Pullum, *The Cambridge Grammar of the English Language* 143 (2002)). If Congress sought to refer solely to the historical fact of designation—with no regard to a regional center's present status—one would expect it to use a different tense. *See id.* at 8 ("[I]f an event is merely a relic of history . . . the past-perfect (not the present-perfect) tense would usually be the more appropriate verb choice."); *Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1262 (11th Cir. 2025) ("[I]f an action is 'wholly in the past—and the time is relatively definite—the simple past is called for.'" (quoting Bryan Garner, *Garner's Modern American Usage* 802–03 (3d ed. 2009))).

Second, Congress chose to discuss the criteria for a *new* regional center in terms of "establishment" rather than "designating" or "designation." Besides the "In general" clause we discussed in section IV.A.1, *supra*, subparagraph (E) contains a clause entitled "Establishment of a regional center." 8 U.S.C. § 1153(b)(5)(E)(iii). This clause details the requirements for a regional center and what a regional-center proposal must include. *Id.* The distinction between "establishment" and "designation" is meaningful.

Sunshine State argues that clause (E)(i), the "In general" clause, governs the availability of *visas* to immigrants who invest in regional centers but neither empowers anyone to designate regional centers nor establishes criteria for becoming designated. In Sunshine State's view, clause (E)(iii), the "Establishment of a regional center" clause, governs those tasks. So, Sunshine State reasons, only regional centers designated after the Act and graded

22                   Opinion of the Court                  24-10007

against the criteria in clause (E)(iii) can be considered "designated under subparagraph (E)." *Id.* § 1153(b)(5)(J)(ii)(I).

This argument falls apart quickly. It cannot be the case, as Sunshine State suggests, that clause (E)(iii), rather than (E)(i), is the source of the authority to designate regional centers. Clause (E)(iii) lacks any form of the word "designate" and doesn't say who is to do the designating. *See id.* § 1153(b)(5)(E)(iii). Meanwhile, clause (E)(i) does both, currently naming the Secretary of Homeland Security as the "designat[ing]" person. *Id.* § 1153(b)(5)(E)(i).

Ultimately, though, whether the power to designate regional centers lies in clause (E)(i) or (E)(iii) is less critical than what these clauses show about what it means to "designate" a regional center.[5] Clause (E)(iii) is entitled "Establishment of a regional center." It governs the creation—or establishment—of *new* regional centers. And so it speaks in terms of what "proposal[s] to establish a regional center" must include. *Id.* § 1153(b)(5)(E)(iii). Clause (E)(i), on the other hand, speaks of regional centers that already "ha[ve] been designated." *Id.* § 1153(b)(5)(E)(i).

And clauses (E)(i) and (E)(iii) don't just differ temporally. A subtle but important distinction separates the word "designate," which clause (E)(i) uses, and "establish," which clause (E)(iii) employs. Something is "established" at a single moment in time. That's why the first definition of "establish" is "[t]o settle, make, or

---

[5] After all, a regional center designated under either clause (E)(i) or clause (E)(iii) would still be "designated under subparagraph (E)."

fix firmly; to enact *permanently.*" *Establish*, Black's Law Dictionary (12th ed. 2024) (emphasis added). "Designate," for its part, means "[t]o choose (someone or something) for a particular job or purpose." *Designate*, Black's Law Dictionary (12th ed. 2024). So a "designation" can attach to someone or something only *after* that someone or something already exists. And a designation can be revoked.

This difference between the language in clauses (E)(i) and (E)(iii) only reinforces the point we've already made: The Act's subparagraph (E)—specifically clause (E)(i)—provides the only source of authority for a regional center's designation. And because designation is a status, any regional center that is currently designated is necessarily "designated under subparagraph (E)."

If Congress had wanted the Integrity Fund Fee to apply to only post-Act regional centers, it could have used the word it employed elsewhere in the statute and limited the fee to "each regional center *established* under subparagraph (E)." Or it could have referenced clause (E)(iii) rather than the subparagraph discussing the regional-center program as a whole. *See EB5 Holdings*, 717 F. Supp. 3d at 103 ("[H]ad Congress intended to reference subsection 1153(b)(5)(E)(iii) specifically, it could have, and presumably would have, done so more explicitly."). That Congress chose not to weighs against Sunshine State's position.

3.  <u>A narrow interpretation clashes with the statute as a whole.</u>

Sunshine State argues that the context of the rest of the statute favors its narrow interpretation of the regional centers "designated under subparagraph (E)." Sunshine State's strongest

argument invokes the familiar surplusage and meaningful-varia-
tion canons.  The canon against surplusage means we read statutes
in a way that "if it can be prevented, no clause, sentence, or word
shall be superfluous, void, or insignificant."  *TRW Inc. v. Andrews*,
534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174
(2001)).  The meaningful-variation canon exists on the flipside of
the surplusage canon.  Under the meaningful-variation canon, we
presume that, when a statute uses one term in one place and a dis-
tinct term elsewhere, the difference matters—that is, the distinct
words have different meanings.  *See Sw. Airlines Co. v. Saxon*, 596
U.S. 450, 457–58 (2022).

Here, Sunshine State focuses on the statute's reference to
"each regional center *designated under subparagraph (E)*."  8 U.S.C.
§ 1153(b)(5)(J)(ii)(I) (emphasis added).  Sunshine State argues that
the end of that phrase would be superfluous if *all* regional centers
are "designated under subparagraph (E)."  That qualifier must do
some textual work, Sunshine State posits, and that work limits the
Integrity Fund Fee's application to only post-Act regional centers.
As Sunshine State points out, the Act's text often uses terms such
as "[e]ach regional center," "any regional center," or "[a] regional
center" without the subparagraph (E) qualifier.  *E.g.*, *id.*
§ 1153(b)(5)(F)(i), (I)(iii), (H)(i).  So when Congress did use the qual-
ifier, Sunshine State contends, we must give distinct meaning to
that choice.

This argument is not without force.  The text does refer to
"each regional center designated under subparagraph (E)" even

though simply saying "each regional center" would be a quicker way to refer to all regional centers, pre- and post-Act. USCIS suggests no alternative construction of the difference between "each regional center" and those "designated under subparagraph (E)."[6]

But we interpret "statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)). And reading the Act as a whole, as we do above, shows why Sunshine State's position cannot be correct. In fact, if we took Sunshine State's argument to its logical conclusion, that argument would be self-defeating.

Consider the Act's other references to subparagraph (E). As one example, subparagraph (S) of the Act states that "[n]otwithstanding the expiration of legislation authorizing the regional center program under subparagraph (E)," the Secretary of Homeland Security must continue processing EB-5 applications filed at least a year earlier. 8 U.S.C. § 1153(b)(5)(S). This provision protects EB-5 applicants in case Congress fails to extend the Act's visa set-aside

---

[6] It is conceivable that Congress intended the unqualified term to encompass both currently "designated" regional centers and those whose designation is suspended or terminated. For example, consider a regional center with a temporarily suspended designation. Its employee comes under a permanent injunction "in connection with the offer, purchase, or sale of a security or the provision of investment advice" during that suspension. 8 U.S.C. § 1153(b)(5)(I)(iv)(I). Could the Secretary fully terminate that regional center's designation on that basis? *See id.* § 1153(b)(5)(I)(iv). Perhaps. But because USCIS does not raise this point, we do not rely on it here.

before its scheduled expiration in 2027.  *See id.* § 1153(b)(5)(E)(i), (S).

Sunshine State argues that this provision protects immigrants who invested in pre-Act regional centers.  But the protections concern the "regional center program *under subparagraph (E)*." *Id.* § 1153(b)(5)(S) (emphasis added).  If Sunshine State is correct that pre-Act regional centers are not "designated under subparagraph (E)," then those regional centers would have little to do with the "regional center program under subparagraph (E)."  The protections of subparagraph (S) would not apply.

As another example, Sunshine State points to a clause within subparagraph (E) as implying that Congress presumed pre-Act regional centers "remained viable" after the Act.  But while this clause may show pre-Act regional centers' continued *viability*, it doesn't show that they are exempt from the fee.

This clause protects immigrants who began participating in the regional-center program before the Act.  It provides,

> In processing petitions [for immigrant status] under section 1154(a)(1)(H) of this title for classification under this paragraph, the Secretary of Homeland Security . . . shall deem such petitions to include records previously filed with the Secretary pursuant to subparagraph (F) if the alien petitioner certifies that such records are incorporated by reference into the alien's petition.

*Id.* § 1153(b)(5)(E)(ii).

Subparagraph (F), in turn, relates to the applications that regional centers must make about their "investment offering[s]" before immigrants can use investments in the enterprises to qualify for visas. *Id.* § 1153(b)(5)(F)(i). Under clause (F)(ii), once USCIS approves a regional center's investment offering—"including an approval before March 15, 2022"—EB-5 seekers can rest assured that an investment in that offering fulfills the requirements of the EB-5 program. *Id.* § 1153(b)(5)(F)(ii).

Sunshine State points to subparagraph (E)'s mention of "records previously filed pursuant to subparagraph (F)" and asserts that it effectively incorporates subparagraph (F)'s deference provision and its specific mention of "an [investment-offering] approval before March 15, 2022," the Act's date of enactment. So, Sunshine State urges, subparagraph (F) shows that Congress envisioned that at least some pre-Act regional centers would continue to take new investments in their previously approved offerings.

We agree, but we don't see how that helps Sunshine State. That Congress expected that pre-Act regional centers may continue operating after the Act says nothing about whether Congress intended for those pre-Act regional centers to pay the Integrity Fund Fee. Arguably, Congress's acknowledgment that some pre-Act regional centers would continue to exist makes it even less likely that Congress would have exempted pre-Act regional centers from the annual fee. After all, Congress enacted the fee to fund a mechanism to prevent and investigate fraud—a concern that arose from *the pre-Act regional centers*. It beggars belief that Congress

would impose a fee on only post-Act regional centers to fund investigations of pre-Act regional centers that prompted the fraud concerns.

Not only that, but subparagraph (F) reveals a significant weakness in Sunshine State's argument. Its language shows that something can happen "under" a statutory provision even if it occurred *before* that provision's enactment. Subparagraph (F) speaks of investment-offering approvals "under this subparagraph, *including* an approval before March 15, 2022," the date of the subparagraph's enactment. *Id.* § 1153(b)(5)(F)(ii) (emphasis added). This wording suggests that Congress viewed approvals before the enactment of subparagraph (F) as still qualifying as approvals "under" subparagraph (F). (Had it thought otherwise, Congress could have written of approvals "under this subparagraph *or* before the date of the enactment.")

We ordinarily presume that instances of the same word in the same statute will have the same meaning. *See United States v. Jackson*, 55 F.4th 846, 858–59 (11th Cir. 2022), *aff'd sub nom. Brown v. United States*, 602 U.S. 101 (2024). So too here. Congress made clear that the word "under" does not have the narrowly restricted meaning Sunshine State advocates. True, Congress did not spell out the Act's date of enactment when it levied the Integrity Fund Fee on regional centers "designated under subparagraph (E)." But the word "under" means the same thing in both subparagraphs. So designations "under" subparagraph (E) include designations that

predate enactment of the current statutory home for the regional-center program's designation power.

In short, Sunshine State repeatedly tries to do the statutory Hokey Pokey: put pre-Act regional centers "in" with respect to the benefits of the Act but put them "out" when it comes to the costs. But Sunshine State only "turns itself around." If its arguments were true, Sunshine State would likely be exempt from the Integrity Fund Fee—but only because it would have lost its designation as a regional center altogether.

### B. *The Integrity Fund Fee is not retroactive.*

Sunshine State also argues that it would be "unlawfully retroactive" for USCIS to require it to pay the Integrity Fund Fee. In Sunshine State's view, the annual fee would "impose new duties" on pre-Act regional centers based on their past conduct. The presumption against statutory retroactivity, Sunshine State suggests, prohibits imposing the Integrity Fund Fee on pre-Act regional centers.[7] This argument falls flat.

---

[7] Although Sunshine State styles its retroactivity argument as an alternative theory, that argument is ultimately a variation of its principal, ultra vires theory—that USCIS violates the Act in imposing the Integrity Fund Fee on a pre-Act regional center. But Sunshine State does not complain of a retroactive effect in the ordinary sense of "altering the *past* legal consequences of past actions." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring). Instead, it discusses a "secondary" retroactive effect. *See id.* at 220 ("A rule that has unreasonable secondary retroactivity—for example, altering future regulation in a manner that makes worthless substantial past

We assess arguments about statutory retroactivity using the two-step test from *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994). *See Rendon v. U.S. Att'y Gen.*, 972 F.3d 1252, 1258 (11th Cir. 2020). First, we "determine whether Congress has expressly prescribed the statute's proper [temporal] reach." *Landgraf*, 511 U.S. at 280. Second, if Congress did not do so, we consider whether the statute would have a "retroactive effect" in that "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*

Sunshine State's effort to recast a future fee as a "penalty on old conduct" fails. We assume without deciding that the Act is ambiguous enough as to whether Congress prescribed its temporal reach under step one because step two is cut and dry.

Without a doubt, the Integrity Fund Fee is forward-looking. The first of these fees came due many months after Congress passed the Act. And as we've explained, the Act requires all currently designated regional centers to pay the annual Integrity Fund Fee. A prospective fee for continued participation in the regional-center program is not a new duty with respect to a transaction

---

investment incurred in reliance upon the prior rule—may for that reason be 'arbitrary' or 'capricious' and thus invalid." (citation omitted)). Secondary retroactive effects may be more appropriately challenged through arbitrary-or-capricious review. *See id.* That said, Sunshine State did not maintain before us the arbitrary-or-capricious challenge it raised in the district court. It also declined to make constitutional claims that can apply to government action with secondary retroactive effects.

already completed. *Cf. In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998) (declaring "not retroactive" a statute imposing prospective fees on debtors who had already entered bankruptcy). Indeed, the Act's fee provision is precisely the type of statute the Supreme Court has called "uncontroversially prospective." *Landgraf*, 511 U.S. at 269 n.24 (describing "a new property tax" as prospective even if it "may upset the reasonable expectations that prompted those affected to acquire property" before its enactment). So the presumption against statutory retroactivity does not affect our interpretation of the Act.

## V.    CONCLUSION

For the reasons we've explained, we affirm the district court's denial of Sunshine State's motion for summary judgment and its grant, in part, of USCIS's motion to dismiss.

**AFFIRMED.**

24-10007          Rosenbaum, J., Concurring          1

Rosenbaum, Circuit Judge, Concurring:

I write separately to note two additional points that support the Court's interpretation. First, reading "designated under subparagraph (E)" to exclude pre-Act regional centers would produce an implausible outcome under other parts of the Act. *Cf. Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 359 (2021) (discussing interpretive canons giving way because of a "contextually implausible outcome"). Namely, that contrary reading would carve out pre-Act regional centers—the source of the fraud and abuse that drove Congress to reform the program—from the Act's anti-fraud requirements.

One other part of 8 U.S.C. § 1153(b)(5) uses the precise phrase "regional center designated under subparagraph (E)."[1] Subparagraph (G) requires "[e]ach regional center designated under subparagraph (E)" to submit detailed annual statements certifying its compliance with a range of requirements that the Act newly implemented. 8 U.S.C. § 1153(b)(5)(G)(i). Those requirements insist that "regional center[s] designated under subparagraph (E)" comply with securities laws, preclude individuals who have committed various offenses involving fraud or deceit from involvement in the regional center, and follow certain rules when promoting investment opportunities or the visa process to foreign investors. *See id.* § 1153(b)(5)(G)(i)(I)–(III). And the reports subparagraph (G) requires must provide detailed accountings of the capital invested in

---

[1] Other than clause (E)(i) itself, the Act does not refer to "designated" regional centers without the extra words "under subparagraph (E)."

the regional center and how the new commercial enterprise is using the capital allocated to it, making progress towards completing its projects, creating new jobs, and much more. *Id.* § 1153(b)(5)(G)(i)(IV)–(VII).

Then, a later part of this subparagraph permits the Secretary to impose sanctions against a regional center for submitting false annual reports or "conducting itself in a manner inconsistent with its designation under subparagraph (E), including any willful, undisclosed, and material deviation by new commercial enterprises from any filed business plan for such new commercial enterprises." *Id.* § 1153(b)(5)(G)(iii)(I).

As we've explained, when Congress passed the Act, a significant goal was ending the corruption and fraud that had plagued regional centers for years. *See* 168 Cong. Rec. S1105 (daily ed. Mar. 10, 2022) (statement of Sen. Chuck Grassley); 168 Cong. Rec. S1090–91 (daily ed. Mar. 10, 2022) (statement of Sen. Patrick Leahy). Indeed, Congress's reform to the EB-5 program targeted the features of the regional-center program that "invite[d] fraud and abuse." Press Release, Sen. Chuck Grassley, Grassley, Leahy Introduce New EB-5 Investor Visa Integrity Reforms (Mar. 18, 2021), https://www.grassley.senate.gov/news/news-releases/grassley-leahy-introduce-new-eb-5-investor-visa-integrity-reforms [https://perma.cc/R2Q7-TL98].

But adopting Sunshine State's reading of "under subsection (E)" would exempt pre-Act regional centers from the Act's annual report section. As a result, the Secretary would continue to lack

24-10007              Rosenbaum, J., Concurring                    3

insight into pre-Act regional centers' finances and operations. And she would have fewer tools to sanction problematic conduct that pre-Act regional centers commit. Given that pre-Act regional centers' fraudulent and abusive behavior spawned these reforms that the Act imposed in the first place, it would make no sense for the Act to have left pre-Act regional centers to continue unchecked. So excluding those regional centers from the tightened requirements of the Act is an implausible reading we need not and do not make.[2]

Second, one other factor supports the broad interpretation of "regional center designated under subparagraph (E)." The Act includes a subparagraph—subparagraph (M)—detailing the "[t]reatment of good faith investors following program noncompliance." 8 U.S.C. § 1153(b)(5)(M). That subparagraph gives a 180-

---

[2] Of course, I do not propose to use legislative history to inject ambiguity into unambiguous statutory language. *See Bostock v. Clayton County*, 590 U.S. 644, 674 (2020). But we deal here with a statutory phrase that is not nearly so clear. *See* Maj. Op. at 13. Although I am aware that it has fallen out of favor in some circles, we have recently reiterated that "congressional intent (and legislative history) still have a legitimate place in the interpretive enterprise." *Drazen v. Pinto*, 106 F.4th 1302, 1345 (11th Cir. 2024) (quoting *Harris v. Garner*, 216 F.3d 970, 999 n.13 (11th Cir. 2000) (en banc) (Tjoflat, J., concurring in part and dissenting in part)). Indeed, many scholars have suggested that contemporary textualism, or at least the iteration most averse to legislative history, has not lived up to its promises of promoting determinacy in the law and limiting judicial discretion. *See* William N. Eskridge, Jr., et al., *Textualism's Defining Moment*, 123 Colum. L. Rev. 1611, 1614 (2023). I echo Justice Sotomayor's considered view. Most respectfully, I fail to see the wisdom of judges "clos[ing] their eyes to reliable legislative history—and the realities of how Members of Congress create and enact laws—when it is available." *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 171 (2018) (Sotomayor, J., concurring).

4                    ROSENBAUM, J., Concurring                    24-10007

day grace period for immigrant investors whose regional center has its designation terminated under the EB-5 program. *Id.* § 1153(b)(5)(M)(ii). Those investors retain their conditional permanent resident status or place in line for immigrant status while finding a different regional center to associate with or another new commercial enterprise to invest in. *See id.* § 1153(b)(5)(M)(i), (v).

These protections suggest Congress expected pre-Act regional centers to pay the Integrity Fund Fee and realized that such payments or other new requirements may cause some pre-Act regional centers to close. So it ensured good-faith investors wouldn't be left high and dry in that circumstance. "A court must interpret a statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *Boroski v. Dyncorp Int'l*, 700 F.3d 446, 452 (11th Cir. 2012) (citation modified) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). The broad interpretation of "designated under subparagraph (E)" recognizes the Act's coherent policy framework. That subparagraph (M) dovetails with this framework reinforces our conclusion.